The STEARNS CO., LTD., Plaintiff,

v.

UNITED STATES, Defendant.

No. 594–89 L.

United States Court of Federal Claims.

Aug. 5, 2002.

Bruce Clark with Judith Villines and Michelle Whittington, of Frankfort, Kentucky, for plaintiff.

Silvia Sepulveda–Hambor, General Litigation Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. Daniel Kilduff, Office of the Solicitor, Washington, D.C., and Courtney Shea and Charles Gault, United States Department of Interior, Office of Solicitor, Knoxville, TN, were of counsel.

### *OPINION*

SMITH, Senior Judge.

### *Introduction*

Plaintiff originally owned valuable coal, which it intended to mine. It also owned the surface land. After selling the surface land to the federal government in 1937, reserving its coal and mineral rights, plaintiff continued to mine the property for many years. In doing this it complied with all federal and state mining and environmental regulations. Under Kentucky law, coal is a dominant estate. This means that the coal owner has the right to mine, with underground mines, despite the wishes of the surface owner. In fact, the surface owner must take no action that interferes with the coal owners ability to mine its coal. Of course, all mining must comply with appropriate regulations, but that is not at issue in this case.

What is at issue is the fact that the Surface Mining Control and Reclamation Act of 1977 (SMCRA), Public Law 95–87, 30 U.S.C. §§ 1201 *et seq.*, reversed the basic structure of rights between surface and subsurface owners. After SMCRA, plaintiff coal owner could only mine with the permission of the surface owner. This permission is not a regulatory action. The government now has a purely discretionary power to benefit its property at the expense of the plaintiff's property. The power appears to be governed by no standards; however, the court assumes that the Secretary could not use the discretion irrationally to discriminate against an applicant on the basis of race or religion, or other invidious reason. However, the discretion is broad enough to determine that the

property owner's rights are subservient to the public's rights. This effectively destroys existing Kentucky property rights.

The government argues that the compatibility determination required by the SMRCA scheme is not a taking because it has never denied a request to mine and that this case is not ripe because plaintiff has never sought a compatibility determination. All of this misses the point. Ownership and use are not synonymous. The fact that my neighbor always lets me use his lawnmower does not mean I own it. In this case, plaintiff's ownership has been effectively made subservient to another owner's property, in this case that of the United States. This is a physical taking by operation of law. As noted previously by this court, the government of our free people rarely takes anything by physical force. *See Hage v. United States,* 51 Fed.Cl. 570 (2002). This is no exception. The taking was achieved here by a statute that eliminated traditional property rights. Therefore, plaintiff must be compensated under the Fifth Amendment.

This opinion is issued following a well-litigated trial held both in Lexington, Kentucky and Washington, D.C., and the conclusion of closing arguments and post-trial briefing.

### FACTS

In 1937, Stearns Coal and Lumber Company, now known as The Stearns Company, transferred its surface rights in approximately 47,000 acres in McCreary and Wayne Counties, Kentucky to the United States. The property was to be used as a national forest under the management of the United States Forest Service (USFS), pursuant to the Weeks Act of 1911, c. 186, 36 Stat. 961, (codified as amended in scattered sections of 16 U.S.C.). The area became part of the Cumberland National Forest, which was later renamed the Daniel Boone National Forest. Stearns' deed reserved "all metalliferous metals, coal, oil, gas and limestone in, upon and under" the 47,000 acres "in perpetuity." Tr. Trans. at 168–172 (Gable); Pl.Ex. 140. The deed went on to provide that "all operations for mining and removing same

shall be done and carried on in accordance with the following rules and regulations prescribed by the Secretary of Agriculture." Pl. Ex. 140. The Secretary's 1911 Rules and Regulations were all included in the text of the 1937 deed, except for one regulation exempting Stearns from compliance with any laws, rules or regulations established subsequent to this agreement. Pl. Br. at 22, n. 15. From 1937 until 1975 Stearns continuously operated underground mines and support facilities on the 47,000 acres, known as Tract 1874, in cooperation with the Forest Service and in compliance with the 1911 Rules and Regulations.

The Office of Surface Mining Reclamation and Enforcement (OSM) was charged with implementation of SMCRA's provisions, after its enactment on August 3, 1977. Section 522(e)(2) of SMCRA, 30 U.S.C. § 1272(e), states in pertinent part:

> After the enactment of this Act and subject to valid existing rights no surface coal mining operations except those which exist on the date of enactment of this Act shall be permitted—
>
>    *    *    *    *    *    *
>
> (2) on any Federal lands within the boundaries of any national forest: *Provided, however,* That surface coal mining operations may be permitted on such lands if the Secretary finds that there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations and—

The Act goes on to state that,

> (A) surface operations and impacts are incident to an underground coal mine;
>
> . . . .

Stearns leased 8,300 acres of Tract 1874, now within the Daniel Boone National Forest, to Ramex Mining Corporation in November 1980. Ramex obtained underground coal mining permits from the Kentucky Department for Natural Resources and Environ-

mental Protection, obtained approval from the USFS, and began mining operations. On December 3, 1980, however, Ramex received a letter from OSM advising that it could not "commence [mining operations] prior to a determination by the Office of Surface Mining that Ramex has 'valid existing rights' to mine the involved lands." The letter stated that surface coal mining is not allowed on federal lands in a National Forest unless the miner has valid existing rights and underground mining is permitted only "where the surface effects are found not to be incompatible with significant recreational, timber, economic, or other values." The letter stated that OSM was looking forward to "receiving Ramex's application for a determination of valid existing rights or a compatibility finding in the near future prior to the commencement of operations."

Ramex ceased operations and sought a compatibility determination. Soon thereafter, pursuant to the terms of its lease agreement, Stearns requested that Ramex withdraw its request for a compatibility determination and Ramex did so. In a January 16, 1981 letter, OSM restated its earlier position and added that "any mining or reclamation activities not authorized in previous correspondence to your company would be considered a violation of the Act, thus requiring appropriate enforcement action." Ramex continued to mine. On February 11, 1981, OSM ordered Ramex to cease mining for 30 days for conducting coal mining operations within a National Forest without having complied with Section 522(e)(2), and for reclamation violations. Ramex did not reapply for a compatibility determination based on its belief that the OSM actions under SMCRA did not apply to its mining operations.

Stearns and Ramex argued in United States district court[1] and on appeal that the surface effects of their deep mining operations would not take place on "federal lands"

---

1. Ramex, rather than pursue the administrative review and adjudication process provided by SMCRA, sought a declaratory judgment that it was entitled to mine coal under the Daniel Boone National Forest. Eugene E. Siler, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky, rendered a partial declaratory judgment holding that plaintiffs' proposed mining would occur under and on federal forest land and, thus, fell under § 522(e)(2). He then dismissed at plaintiffs' request so that plaintiffs could appeal from the declaratory judgment. *Ramex v. Watt,* 753 F.2d 521 (6th Cir.1985).

and, thus, were not included under SMCRA. *Ramex v. Watt*, 753 F.2d 521 (6th Cir.1985). Instead, they argued, those effects would be limited to Stearns' privately-owned mineral estate including its easement across and through the surface as reserved in the 1937 deed. At that time the plaintiffs argued that failure to so recognize Stearns' easement would constitute a compensable taking under the Fifth Amendment. The district court and the Sixth Circuit ruled that the taking claim would not be ripe until Stearns exhausted the administrative remedies available under the Act, namely a determination by OSM as to whether Stearns possessed "valid existing rights" (VER).

The test for VER at that time was the "good faith, all permits test" under which one must have secured, or in good faith applied for, all permits required to conduct mining prior to the enactment of SMCRA on August 3, 1977. Def. Br. at 3, n. 2; *see* n. 2 *infra.* Stearns did not have permits but, pursuant to the Sixth Circuit's ruling, nevertheless sought recognition of its valid existing rights. On December 3, 1986, OSM determined that Stearns lacked valid existing rights to mine. Stearns brought this suit in the Court of Federal Claims contending this denial was a taking of their property.

## DISCUSSION

### I. JURISDICTION

■ The government argues that plaintiff's taking claim is barred by this court's six year statute of limitations since OSM's letter to Ramex was dated December 3, 1980 and plaintiff did not file its taking claim until 1989.

The court finds that the statute of limitations was tolled while plaintiff argued in district court and in the Sixth Circuit that its deep mining rights were not "on federal lands" and, alternatively, asserted its taking claim in those courts. Those very courts held that Stearns' taking claim was not ripe until the company obtained a determination as to "valid existing rights." Stearns then complied with that requirement. To argue that the statute of limitations bars plaintiff's claim would mean that plaintiff could never bring a taking claim. The claim, under the government's theory, would not be ripe until the VER determination had been appealed, and by that time, the statute of limitations would have expired. When this sequence appears in a comedy, it is ludicrous. When it appears as a legal argument, it is simply unjust.

Accordingly, the court finds that Stearns' taking claim was timely filed in this court, less than three years after OSM's determination that Stearns lacked "valid existing rights." Furthermore, the court finds that Stearns had existing property rights when Ramex's mining operations were curtailed by OSM's December 3, 1980 letter. The negative VER determination denied Stearns and its lessee the right to mine. It was the critical event. Whether the compatibility determination allowed plaintiff to mine as an act of grace was irrelevant to this issue. Allowing someone permission to use the property you took from them does not undue the taking.

The government's assertions would put Stearns in a classic Catch–22 situation. On the one hand, had Stearns filed a takings claim prior to determining its valid existing rights or obtaining a compatibility determination then the government would have argued that plaintiff's action is premature. On the other hand, despite the fact that it claims no taking occurred, the government argues that plaintiff's cause of action arose in 1980 upon receipt of the December 3 letter and that as a result, plaintiff's 1989 filing is out of time. The government's statute of limitations defense must fail. It is also inconsistent with government's own position in this case.

### II. ANALYSIS

SMCRA section 522(e)(2) allows certain surface operations and impacts on federal lands which are incident to an underground coal mine within the boundaries of a national forest. Such surface operations and impacts, however, are permitted only in two exceptional situations, first pursuant to VER or second, lacking VER, "if the Secretary finds that there are no significant recreational, timber, economic, or other values which may

be incompatible with such surface mining operations." 30 U.S.C. § 1272(e) (1986 & Supp.2002).

This compatibility proviso does not magically transform what would otherwise be a taking. Simply because the Secretary has the discretion to grant a permit to applicants such as Stearns does not alter the fact that as a result of the enactment of SMCRA and the December 3, 1980 letter, the property rights previously held by Stearns were transferred to the government. When the owners' rights over the parcel change through government action, then a taking has occurred. Its occurrence or non-occurrence is not resolved on the basis of whether an alternative mechanism, such as a compatibility provision, would permit the owner to seek permission to do what he was entitled to do with his parcel prior to the taking. Moreover, in this case, plaintiff's property had already been taken by government action before the compatibility proviso became relevant to the proposed mining operation.

Surface mining, as defined in SMCRA, is not just strip mining. It includes surface operations and impacts that are necessarily incident to underground mining. *See* 30 U.S.C. § 1291(28) (1986 & Supp.2002). Stearns would have conducted such surface operations and caused such impacts, including, transporting coal over the surface and accessing its subterranean coal through the surface.

With two exceptions, SMCRA was meant to prevent surface mining on federal lands in national forests. The first exception is based on valid existing rights. Those who have VER are simply exempted from the prohibition against surface mining. If OSM had determined that Stearns had VER, Stearns or its lessee would have been able to mine since all mining permits were in place. Although the government has not shown that Stearns' rights, as established by the 1937 deed, were invalid, it suggests that at some point those rights ceased to exist, notwithstanding the fact that they were clearly preserved "in perpetuity." That point when Stearns' rights ceased to exist could only have been when OSM arbitrarily imposed a "use it or lose it" standard for VER, the "good faith all permits test."

The second exception to SMCRA's prohibition on mining on federal lands is based on the compatibility proviso. Under this proviso, the Secretary of Interior can make a discretionary determination that the mining permit at issue would not be incompatible with the federal government's stewardship of the land in question. This is a discretionary determination and if made amounts to a waiver of SMCRA's mining prohibition.

The government argues that plaintiff's claim amounts to a facial, not an "as applied" challenge to SMCRA. According to the government, only a finding of non-compatibility could constitute a final decision for takings purposes. Defendant asserts that because Stearns caused Ramex to withdraw its request for a compatibility determination, its takings claim is not ripe. Furthermore, the government argues, had Ramex's request for a compatibility determination been allowed to proceed, a favorable determination would have been quickly made. Our deliberations do not turn, however, on the likelihood that the Secretary would have determined Stearns' proposed operations to be compatible with "significant recreational, timber, economic, or other values." Rather, they turn on the distinction between property rights and discretionary authority.

Stearns mined Tract 1874 for many years after deeding the surface to the United States, but stopped mining in 1975, before SMCRA was enacted on August 3, 1977. Although it had reserved its right to mine in its deed to the United States, it did not have permits in place, nor had it applied for permits, at the time of SMCRA's enactment. At various times, including the present, the standard established by regulation for determining valid existing rights has been "the takings test."[2] On December 3, 1980, how-

---

**2.** *See, e.g.,* 48 Fed.Reg. 41,313 (1983): Relying upon the Act's legislative history, "valid existing rights" with regard to protected areas existing on the date of enactment, August 3, 1977, may be generally defined as property rights existing on that date which, if affected by the prohibitions established in section 522(e), would entitle the property owner to payment of just compensation

ever, the standard was "the good faith, all permits test." Under this test one must have secured, or in good faith applied for, all permits required to conduct mining prior to the enactment of SMCRA. In applying that standard, OSM determined that Stearns lacked valid existing rights. Thus, OSM, pursuant to the statute and its implementing regulations, took away plaintiff's right to mine. This court has no authority to determine if this regulatory decision was right or wrong. However, the court does have a duty to determine whether Stearns had constitutionally protected property rights prior to the time of government action. It was undisputed that Stearns had valid and traditional property rights under both Kentucky and federal law to the property in question when OSM found that Stearns had no valid existing rights to mine.

Except for filing suit, Stearns' only option after determining it lacked VER would have been to file for an exception to SMCRA's prohibition on mining on federal lands based on the compatibility provision. The government makes much of the fact that Stearns did not pursue this option. However, as previously mentioned, this option is not the same as ownership. If Stearns had chosen this route, the Secretary may or may not have then granted what can best be described as a license to mine depending upon his determination as to whether or not such proposed surface operations were or were not compatible with "significant recreational, timber, economic, or other values." Pl. Br. at 26, Def. Br. at 13. Despite the fact that the government highlighted the apparent ease of obtaining compatibility exceptions, it is not the same as ownership. Mr. James Taitt testified for the government that "we would tell the companies, 'You can request valid existing rights, but to underground mine you don't need it.' All you need is a compatibility finding which is essentially a rubber stamp." Tr. Trans. at 2225 (Taitt). Mr. Taitt explained that OSM had issued 18 compatibility findings within the Daniel Boone National Forest since 1982 and that no requests have been denied. Tr. Trans. at

2207. In fact, another mining company, Blue Diamond, requested a VER determination but instead OSM issued a compatibility finding rather than "waiting for the VER process to run its course of action" Tr. Trans. at 2223 (Taitt). Even if compatibility findings are granted, this does not change the fact that Stearns' right to mine has been fundamentally altered by SMCRA and the government's subsequent regulatory actions.

Defendant explained that "[I]t is only as a consequence of Congress' desire to accommodate strip mining in western states that the language of Section 522(e)(2) in H.R. 25 was modified and the compatibility provision, incidentally, became applicable to the surface effects of underground mining." Def. Br. at 6. This may be the case, and it may even be true that legislators expected that underground mining operations would have little or no problem obtaining compatibility determinations. Nevertheless, incidentally or otherwise, plaintiff was prevented from mining because of the government's determination that it lacked valid existing rights. The fact that an act of governmental grace or benefit may have returned, with respect to this parcel, the plaintiff's right to mine does not alter the denial of rights.

Stearns carefully preserved its mining rights when it sold the surface of the subject property to the United States in 1937. The owner of the Stearns Company, Mr. Gable, testified at trial that Stearns entered into a contract with the federal government to sell 47,000 acres of land for use as a national forest. Tr. Trans. at 55. The agreement, as manifested by the deed, was structured in such a way as to reserve plaintiff's rights in the minerals underlying the surface, thus establishing a severed estate with the government owning the surface rights and plaintiff owning the mineral rights. The 1937 deed of sale included express provisions allowing Stearns to recover such minerals, in this case coal, and use the surface land as is reasonably necessary according to good practice.

under the "5th and 14th Amendments." *See also,* 30 C.F.R. § 761.5, Definition of valid exist-

ing rights (a) (1998).

■ Mr. Gable's testimony and interpretation of the deed was supported by Carolyn S. Bratt, a Professor of Law at the University of Kentucky College of Law, who the court qualified as an expert witness in the area of Kentucky property law. Professor Bratt testified persuasively that the 1937 deed clearly established a severed estate under Kentucky law between Stearns and the federal government, with Stearns holding the dominant estate and the government owning the servient estate. Professor Bratt further testified that Kentucky, like all but one of the 50 states, follows the Doctrine of Dominance, which "carries with it an implied appurtenant easement for the use of the surface giving the holder the right to access and use the surface for the purpose of removing your minerals." Tr. Trans. at 910 (Bratt).

Accordingly, the court finds that under Kentucky law, plaintiff's carefully retained mineral estate included the right to access those minerals, over and through the surface, a dominant appurtenant easement. *See Imperial Elkhorn Coal Co. v. Webb*, 190 Ky. 41, 225 S.W. 1077, 1078 (1920); Ky. Const. § 19 (mineral estate dominant); *McIntire v. Marian Coal Co.*, 190 Ky. 342, 227 S.W. 298, (1921). Plaintiff had a valid easement and that easement constituted a property right which is protected under the Fifth Amendment. See *United States v. Welch*, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787 (1910), *Lowndes v. United States*, 105 F. 838 (C.C.D.S.C.Cir.1901).

■ Until it learned that its easement came within OSM's definition of federal lands and that its lessee, Ramex, could not mine without a compatibility determination, Stearns was free to offer its unencumbered easement, along with its mineral estate, for sale or lease to others. Once subject to OSM's unfavorable interpretation of the term "on federal lands" and, lacking "valid existing rights," it could no longer do so. At that point, the best option plaintiff could offer a potential purchaser or lessee was the right to seek permission to mine from the Secretary of Interior via the discretionary compatibility provision. The right to seek permission does not have much value in the marketplace. As stated in *Del Rio Drilling*, "[T]he 'right' to

exploit the minerals would be worthless without the additional right to access them. If the lessee of the mineral estate has to ask the owner of the surface for a right-of-way to access the minerals, then the lessee has no easement at all." *Del Rio Drilling Programs, Inc. v. United States*, 35 Fed.Cl. 186, 195 (1996), *superseded by* 37 Fed.Cl. 157 (1997), *reversed on other grounds and remanded by* 146 F.3d 1358 (Fed.Cir.1998).

The government argues that "although Kentucky courts have joined with a number of states in holding that when a fee estate is severed into surface and mineral estates, the mineral estate is the 'dominant' estate and the surface estate the 'servient' estate, these are merely analytical labels which have significance only if a specific deed of severance is silent or unclear concerning the relative rights of the mineral estate owner and surface estate owner." Def's. Reply Br. at 24, n. 26. The government concludes that specific provisions of the 1937 deed limit the scope of Stearn's surface easement. By contrasting the largely unrestricted rights of the mineral owner under a "broad form deed," such as that at issue in *McIntire*, with the more restricted rights preserved in the Stearns 1937 deed, the government argues that Stearns "bargained away to the United States substantial control over its use of that easement." Def.'s Reply Br. at 28 (citing Professor Rivkin, Tr. Trans. at 3040, 3060). Still, the government's expert, Professor Rivkin, conceded that nothing in the Stearns deed actually eliminates the dominance of Stearn's mineral estate. Tr. Trans. at 3040–41.

With respect to strip mining, not underground mining, the District Court for the Eastern District of Kentucky stated that "it was never the intention of the parties that the mineral owner's (Stearns') rights to use the surface in the removal of minerals would be superior to any competing right of the surface owner (United States)." *United States v. The Stearns Co.*, 595 F.Supp. 808, 811 (1984). Stearns deed, at paragraph 8.2, provides for as much disturbance of the surface as is "reasonable and necessary" for Stearns to mine its coal. On appeal, the Sixth Circuit found that this language did not

mandate "subordination of the surface estate to the mineral estate." *United States v. The Stearns Coal and Lumber Co.*, 816 F.2d 279, 283 (6th Cir.1987). The Sixth Circuit's finding that the 1937 deed did not allow strip mining did not necessarily mean, however, that Stearns did not otherwise hold the dominant estate. The Sixth Circuit opinions address Stearns' rights under the deed only in the context of its right to strip mine, not deep mine. The issue of Stearns' right to deep mine was not litigated before that forum and thus, is not relevant to the issue before this court. As both Professors Bratt and Rivkin testified, the 1937 deed confirms that Stearns holds the dominant estate for deep mining purposes.

Accordingly, the court now finds that the terms of Stearn's 1937 deed assured the company the right to deep mine. The deed's restrictions did not determine whether Stearns would be allowed to mine, they merely determined how it was to do so. The restrictions outlined in the 1937 deed were specific and related to the protection and preservation of the National Forest. Stearns was assured of its right to mine by complying with the deed terms.

SMCRA's compatibility proviso, on the other hand, is inconsistent with any right to mine. The Secretary may, at his discretion, deny permission to mine based on a whole new set of criteria not included under the 1937 deed.[3] Thus, the denial of VER effectively ended Stearns' rights to mine, replacing them with Secretarial discretion, based upon the Secretary's assessment of the effective or desirable use of the government's property.

A servient estate is not without rights and a dominant estate does not bestow the freedom to run roughshod over the rights of the servient owner. By relinquishing greater control to the United States than *McIntire* did in its broad form deed, Stearns did not render its mineral estate servient. It merely agreed to abide by certain provisions designed to protect the National Forest.

The government makes much of the fact that plaintiff agreed in 1937 to abide by regulatory restrictions on mining. The regulatory restrictions referenced in the deed, however, were known, and agreed to by plaintiff at that time. The Secretary of Agriculture's 1911 rules were fundamentally different than SMCRA and its implementing regulations. The 1911 rules referenced in Stearns' deed contemplated mining and merely dictated how mining would be conducted, not whether it would occur at all. Most importantly, the compatibility provision is not a mining regulation; rather it is a discretionary power Congress gave to the Secretary to determine whose use of the property takes precedence. Thus, this is not a *Winstar*-type case nor a regulatory taking case. Though, as noted below, there may be some analogy to a *Winstar*-type contract case.

In its deed Stearns agreed that "all operations for mining and removing [minerals] shall be done and carried on in accordance with the following rules and regulations prescribed by the Secretary of Agriculture." It incorporated "the following rules." It then restated, word for word, each of the Secretary's 1911 rules that were to be made part of the deed. Those rules clearly contemplated mining. For example, rule two states "In prospecting for, and in mining and removing minerals ... only so much of the surface shall be occupied, used or disturbed as is reasonable and, according to recognized good practice, necessary for the purpose." This language does not suggest that plaintiff was prepared to be denied its right to mine based on interference with recreational usage of the National Forest. Rule three calls for "reasonable and usual provisions" to support the surface above underground mines and requires that Forest officers be allowed to inspect for that purpose. Rule four calls for prevention of "obstruction, pollution, or deterioration of streams, lakes, ponds, or springs." The rule does not contemplate prohibiting mining to prevent pollution, however. Instead, it requires that "operators shall make provisions by ditches, pipes, pumps or other approved practical methods" to prevent pollution. Rules six and seven

---

**3.** The government's witness said he could never think of OSM denying compatibility because of a recreational problem but added, "You can never say never." Tr. Trans. at 2346 (Taitt).

even contemplate "using" timber from the National Forest in the mining operation and merely requires that the operator pay for the timber and not cut, destroy, or damage forest growth "unnecessarily." Rules eight and nine contemplate "buildings, camps, roads, bridges and other structures or improvements necessary in carrying on mining." Even failure to remove such improvements merely results in their becoming the property of the United States. Rule ten requires the operator to clean up refuse and waste materials when the mining operation is complete.

While Stearns may have "bargained away" some of its rights, it did not relinquish its rights to underground mining. The language of the 1937 deed clearly reflects the fact that Stearns expected to mine. If Stearns had been faced in 1937 with a deal that gave the Secretary the ability to prevent mining, at his discretion, without compensation, Stearns would have very likely declined to sell the surface to the government. The severed estate that was created by the 1937 agreement and deed has now been unilaterally modified by the government. Stearns has been deprived of its property and is entitled to compensation.

This is a case involving the taking of property, however it has some analogy to the contractual issues involved in the *Winstar* cases. The land sale in 1937 expressed the parties allocation of rights in the same physical space. Mineral rights and surface rights were established in a particular relationship. That was part of the "deal", unlike the more common land sale which involves no continuing relationship. Just as Winstar found no basis for the government to change the deal after the fact, the sale of property in this case can not be modified by one party *ex post facto*. See *U.S. v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Mobil Oil Exploration v. U.S.*, 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000).

In summary, the court finds the government deprived Stearns of its mineral estate as reserved in the 1937 deed by its actions subsequent to the enactment of SMCRA. This deprivation effected a taking of Stearns property rights and thus just compensation is due.

## III. RIPENESS

The government argues that Stearn's claim amounts to a facial, not an "as applied," challenge to SMCRA. D. Br. at 12, 13, 41, 42. According to the government, only a finding of non-compatibility could constitute a final decision for takings purposes. The government's assertion that a finding of compatibility was merely a rubber stamp, routinely bestowed, does not alter the fact that a finding of compatibility is discretionary on the part of the Secretary and may also be denied. It is not a regulatory decision subject to rational standards. Rather, it is a new power given to one land owner over the property of another by government authority. The government argues that, because Stearns caused Ramex to withdraw its request for a compatibility determination, its taking claim is not ripe for judicial review. Contrary to the government's assertion, and as explained below, the court finds that plaintiff's claim is based on OSM's application of SMCRA and is ripe for our determination as to whether OSM's action resulted in a taking of plaintiff's property.

This taking occurred, not with the enactment of SMCRA, but at the implementation phase. The Act itself did not define VER or compatibility. It was only when the "good faith all permits test" was established as the standard for VER that Stearns lost its easement. But for that application, we would never have reached the question of whether plaintiffs' proposed mining was "compatible" under some undefined, discretionary standard known only to the Secretary of Interior. The "good faith all permits" definition of VER had the effect of foreclosing Stearns' and its lessee's right to mine, rights which previously had been held in perpetuity. It is not up to this court to determine whether the public purpose for this foreclosure was good or bad, for the court must accept that the government has the right to take property for public use. The other half of the 5th Amendment, of course, guarantees that such public use shall not be imposed on the property holder alone, but must in fairness and

justice be shared by the entire public which benefits through the award of "just compensation." As the Supreme Court explained, the Takings Clause is triggered by governmental action which forces "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

## DAMAGES

### I. Standard for Determining Just Compensation

▆▆▆ Now that a taking has been found, this court must determine what dollar amount constitutes just compensation under the Fifth Amendment. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). In arriving at a figure, the court must put the owner in the same financial position as if there had been no taking. *See United States v. Reynolds*, 397 U.S. 14, 15, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). The proper measure for damages in a takings claim is the property's fair market value at the time of the taking. *See Foster v. United States*, 2 Cl.Ct. 426, 446 (1983). Fair market value is an amount determined in a negotiated transaction between a willing buyer and seller absent any compulsion taking into account the factors that well-informed persons would consider under similar circumstances and custom in the industry. *See United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, reh'g denied, 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1943). An owner of property is entitled to have the fair market value of his property valued by its highest and best use. *See Olson v. United States*, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). In this case, it is undisputed that the highest and best use for this estate is as an operating mineral reserve and extraction property.

### II. Valuation of the Stearns Estate

In this case, both parties presented testimony of expert witnesses who were similarly qualified as well as comprehensive and extensive supporting exhibits on the issue of damages. As is often the case, the parties presented widely divergent dollar amounts that would in their minds be just compensation. Plaintiff's experts testified that the damage award should fall in the $17–20 million dollar range whereas defendant's experts offered a much lower figure ranging between $2–3.5 million dollars. The court finds the government's damage model more credible on the whole, but not entirely persuasive. After carefully considering the evidence, the court finds that the plaintiff's estate had a market value of $5 million on the date of the taking, which the court finds to have occurred on December 3, 1980.

### III. Amount of Coal in Reserve

Both plaintiff and defendant presented extensive testimony about the extent of coal in reserve. Mr. Mullenex, one of the government's valuation experts, testified that a maximum of 13.9 million tons of raw, recoverable coal lie in reserve. Tr. Trans. at 3286. In making his estimates, Mr. Mullenex relied on isopachous[4] mapping of coal thickness utilizing measurement data obtained from boreholes, outcrop[5] prospect points, and underground mine measurements. He analyzed coal seams # 1, 1½, 2, and 3, all located on the subject property and found the following: seam # 1 is nearly exhausted and that reserves lie in two small bodies totaling approximately 2 million tons; seam # 1½ has no reserves at all; seam # 2 holds the vast majority of the coal, about 11.1 million tons, or 81% of the total reserve potential; seam # 3 has 0.5 million tons. Tr. Trans. at 3286.

On the other hand, Mr. Boyd, one of plaintiff's valuation experts, found much more coal in reserve, specifically 18.67 million tons in measured and indicated reserves that

---

**4.** Isopach mapping is a map indicating, usually by means of contour lines, the varying thickness of a designated stratigraphic unit such as a coal seam. Dictionary of Mining, Mineral, and Related Terms, U.S. Bureau of Mines, Second Edition, U.S. Department of the Interior, 1996.

**5.** The part of a rock or coal formation that appears at the surface of the ground. Webster's New Collegiate Dictionary, 1977.

would be marketable. Tr. Trans. at 1091. Mr. Boyd based his conclusions on Stearns' company material, including coal seam measurements from bore hole drillings, outcrop measurements, and from maps of previous mining on the property. Although Mr. Boyd estimated that the total reserve was approximately 62.55 million tons, he offered the 18.67 million figure after subtracting the inferred tonnage due to the lenticular[6] nature of Stearns' property, deducting for coal reserves with less than 60 feet of overburden,[7] taking into account field recovery rates, and expected losses due to washing out impurities.

Both Mr. Mullenex and Mr. Boyd relied on a coal reserve classification system developed by the U.S. Geological Survey (USGS).[8] The classification system provides three specific criteria for evaluating and classifying coal reserves[9] and provides an objective method for evaluating coal reserves and comparing various estimates. Although the classification is widely used, at trial both Mr. Boyd and Mr. Greenwald, for the plaintiff, testified that the USGS system is generally accurate within 20 percent plus or minus of the measured reserve. Tr. Trans. at 1044 (Boyd) and 1460 (Greenwald).

Mr. Greenwald, who had worked as a consultant for the Stearns Co., rejected the USGS's criteria for evaluating coal reserves and concluded based on his personal experience with the property that 44 million tons lie in reserve. According to Mr. Greenwald, applying the USGS criteria to the lenticular nature of the seams would result in an underestimation of the coal reserves. Mr. Greenwald developed his estimate by examining the historical mining records on the property to determine a yield-per-acre figure. In brief, Mr. Greenwald determined that 2,200 tons of coal would be recovered per-acre owned. He then multiplied this figure by the number of unmined acres to arrive at his 44 million ton estimate.

While Mr. Greenwald's view is an informed one based on his years of experience on the property, his reserve estimation approach is not widely used. Thus, the court finds that its emphasis on surface acres rather than coal reserves is the less satisfactory method. However, the court did find Mr. Greenwald a highly credible witness. The court agrees with the government that Stearns' estate should be valued by applying a price-per-ton unit of measure, as opposed to plaintiff's price-per-acre approach. First, the lenticular nature of the property belies the underlying premise of the price-per-acre approach that the coal beneath is somehow evenly or uniformly dispersed. As the government points out, coal has not been found to pervade the subsurface so it is more uncertain than necessary to extrapolate from the gross acreage and mining history the amount of coal that lies beneath. Second, a prospective purchaser will pay value based on how much coal he estimates lies beneath the surface, not on how many acres Stearns has access to, although there is admittedly some relationship between the two. Clearly Stearns mineral rights are valuable only insofar as there are minerals, not acres. Finally, given the fact that the USGS has provided specific criteria for classifying reserves, and these criteria are generally accepted in the industry, the court sees no reason to diverge from

6. A lenticular seam resembles in shape the cross section of a lens, esp. of a double-convex lens. The term may be applied, e.g., to a body of rock, a sedimentary structure, or a mineral habit. Dictionary of Mining, Mineral, and Related Terms, U.S. Bureau of Mines, Second Edition, U.S. Department of the Interior, 1996.

7. Overburden is rock including coal and (or) unconsolidated material that overlies a specified coal bed. Overburden is reported in feet and (or) meters and used to classify the depth to an underlying coal bed. Geological Survey Bulletin 891.

8. See Gordon H. Wood, Jr. et al., U.S. Geological Survey, Circular 891, Coal Resource Classification System of the U.S. Geographical Survey (1983).

9. The three criteria for classifying coal reserves are: measured, indicated, and inferred. A measured reserve is defined as "accessed and virgin coal that lies within a radius of 1/4 mile of a point of thickness of coal measurement." Circular 891. An indicated reserve is defined as "virgin coal that lies between 1/4 mile and 3/4 mile from a point of thickness of coal measurement." *Id.* The inferred measure is defined as "virgin coal that lies between 3/4 mile and 3 miles from a point of thickness of coal measurement." *Id.*

using them as benchmarks for evaluating the competing claims for coal reserves. Thus the court believes that the valuation emphasis should be placed on coal tons per whole property, not average tons per acre times total acres. That is not to say that Mr. Greenwald's testimony is without value. To the contrary, the court takes notice of the fact that he has decades of experience on the property and in the coal industry, and his opinion that significant reserves exist is relevant.

On top of all of this is the unavoidable fact that the only certain way to determine how much coal lies in reserve is to mine it. While that option has been foreclosed by the government's taking, it would be unjust to allow this uncertainty to prevent Stearns from being adequately compensated for its loss. *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946) ("[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.") While here we are not dealing with a wrong, the plaintiff is the party that has suffered the loss. Neither party disputes the fact that valuable, marketable coal lies in reserve. The damages dispute centers on the quantity, quality, and fair market value of the coal reserves.

It is the court's view that plaintiff's estimates of coal on a per-acre basis for the entire property are less credibly supported and probably do not provide a reliable reference for comparison. Plaintiff estimates over three times as much coal as defendant using this method. On the other hand, Mr. Mullennex explained the importance of geological controls in projecting the coal reserve. Those controls influence the distribution of coal beneath the property, mining conditions, and coal quality. For example, Mr. Mullennex regarded thinning of the coal seams near the boundaries of previous mine workings as an indication that those seams were running out at that point and even suggested that the old workings stopped there for that reason. The thinning seams become progressively harder to mine, costing more to operate and returning less over time, making them less valuable. In addition, Mr. Mullenex projected coal reserves outside established mines only when the data showed that coal was there, unlike Mr. Boyd who assumed coal lay in areas next to established mines.

Finally, as previously mentioned, the lenticular nature of the subject property prompts the court to exercise a conservative approach to measuring the coal reserves. At trial, experts for both sides agreed that the property was lenticular, but differed on the effect of this characteristic. Tr. Trans. at 1036 (Boyd), 1459 (Greenwald), 4041 (Naumann). In his testimony, Mr. Boyd downplayed the effect the lenticular nature of the property would have. He testified that when miners encounter lenticular seams they work around it and look for coal in some adjacent area. Tr. Trans at 1038. In support of this position, Mr. Boyd offered a section map of an underground mine in eastern Tennessee that was mined despite its lenticular seams. Pl.Ex. 21. On the other hand, Mr. Naumann, expert for the government, said that properties with lenticular seams are disfavored because they tend to result in a lower recovery rates and involve more risk. Tr. Trans. at 4041, 4550. The court agrees with defendant's expert that this characteristic depresses the coal reserve amount, as well as the fair market value of the property. Thus for the aforementioned reasons, the court finds that out of all the estimates presented, Mr. Mullennex's estimate of 13.9 million raw, recoverable tons is the closest approximation of what exists. (Def. Br. at 57, n. 79.)

In further support of that finding, Mr. Nauman noted that Stearns, according to industry practice, had "higraded" its property, mining the best coal first. Mr. Nauman, using the royalty income approach estimated that Stearns could have mined 677,000 tons of coal per year for 20 years, for a total of 13,540,000, consistent with Mr. Mullennex's estimate. Def. Br. at 62.

Despite the fact that the court finds that the government offered more credible evidence that there was not as much coal in reserve as Stearns' experts claimed, the testimony of Mr. Boyd, Mr. Greenwald, and Mr. Gable provides a basis for the court to adjust the government's amount upward. In addi-

tion, Mr. Gable, the property's owner, testified about the historical coal mining on the parcel and used this history to support his view that substantial amounts lie in reserve. Between 1903 and 1975, 35.8 million tons of coal were recovered from 26 different mines that were operated on this property. Pl. Ex's. 65,66. Mr. Gable testified that the coal was not always found where it was expected and that he found many of the topographic maps and other geologic aids did not predict where coal was later found. Tr. Trans. at 13. The USGS classification system itself acknowledges that its system for classifying reserves is accurate within 20 percent, plus or minus. The court feels that based on this evidence that an upward adjustment of 20 percent is reasonable, bringing the total reserve to approximately 16 million tons.

## IV. Market Value of Coal in Reserve

Having found that approximately 16 million tons of coal lie in reserve, the court now must determine the value of that coal. Plaintiff and defendant offered multiple experts to the court who relied on different valuation theories for fixing the damage award. The damage theories include comparable sales analysis, discounted cash flow analysis, royalty income stream, and personal experience. As the Supreme Court has recognized, the aforementioned valuation techniques will not result in an exact market valuation. *See United States v. Miller,* 317 U.S. at 374, 63 S.Ct. 276.

In this circuit for the purpose of determining fair market value, the fact-finder is not required to rely on comparable sales evidence should it be presented. *See Seravalli v. United States,* 845 F.2d 1571 (Fed.Cir. 1988). In that case, the Federal Circuit stated, "[W]e are unwilling to restrict the trial courts to any single basis for determining fair market value." Id. at 1575. The trial court has broad discretion to determine which valuation method is most appropriate given the facts of the case. *Id., see also Sill Corp. v. United States,* 343 F.2d 411, 416 (10th Cir.1965), cert. denied, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965) (the law is not wedded to any particular formula or method for determining fair market value as the

measure of just compensation). However, comparable sales are considered by the courts to be the best evidence of fair market value, and thus preferable to other forms of valuation, in comparable sales are offered. *See United States v. 50 Acres of Land,* 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984); *Kirby Forest Industries Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984).

In summary, based on comparable sales, for the plaintiff Mr. Greenwald valued the property at $18,830,675 and Mr. Pritchett valued the property at $18,695,000. For the government, Mr. Lipscomb valued the property at $2,250,000 based on comparable sales.

Relying on a discounted cash flow analysis, for the plaintiff, Mr. Pritchett arrived at a figure of $17,295,000 and Mr. Boyd estimated the property's value, based on the royalty income stream and discounted cash flow, at $19.24 million. For the government, Mr. Hans Naumann valued the property at $3,408,272 based on the royalty income approach.

Mr. Gable, the owner of the Stearns Co., offered a figure of $20.1 million based on his personal experience with the property.

Despite the variety, the fact is that the valuation approaches are premised on the same basic factors, namely the quantity, quality, accessibility, and marketability of the coal in reserve. The estimates summarized above show that there is a roughly similar approximation in value between the various methods used by either side.

### A. Comparable Sales

All land is naturally unique and presumed so under the law. *See Snowbank Enter., Inc. v. United States,* 6 Cl.Ct. 476, 484 (1984) (citing *U.S. v. 103.38 Acres of Land,* 660 F.2d 208 (6th Cir.1981)). Stearns' property is no exception. Thus, comparable sales "have probative value only if the subject and comparison properties have similar characteristics and if the comparison sales are not too remote in time or place from the applicable date of valuation and the site of the subject property." *Id.*

Expert appraisers testified that properties that sold for between $1.5 million and approximately $26 million were valid comparables to Stearns' mineral estate. The appraisers made adjustments for time, condition, coal reserves, rail access, location, topography, coal quality, access, and mineability.

Except for the amount and quality of coal in reserve, the experts agreed for the most part about the characteristics of the subject property.

The following table summarizes in reverse chronological order the comparable sales offered by both sides during the trial.

<u>COMPARABLES SALES</u>

| Date of Sale | Parties | Location | Acres & Estimated Coal Reserve | Price | Relied on By Party/Expert |
|---|---|---|---|---|---|
| March 1987 | Stearns to the United States | Kentucky | 288 mineral acres | $160,000, or $554 per acre | Plaintiff/ Gable |
| October 1982 | Blue Diamond to United States | McCreary County, Kentucky | 7,500 coal acres | $4.7 million, or $580/acre | Plaintiff/ Gable |
| December 3, 1980 | Stearns Co. to United States via taking | McCreary County, Kentucky | 47,000 mineral acres, 16 million tons | Undetermined | |
| August 26, 1980 | Kentenia Corp. to Pocahontas Dev. Corp. | Harlan/Bell Counties, Kentucky | 30,000 acres, 67 million tons | $20 million, or $637/acre | Defendant/ Lipscomb |
| June 2, 1980 | R.G. Smith Trust and High Top Coal Co. to Koppers Inc. | Tennessee | 31,500± acre non-contiguous tract in fee, 47 million tons | $26 million, or $897/acre. | Plaintiff/ Greenwald & Pritchett |
| July 1979 | Stearns to the United States | McCreary County, Kentucky | 15,288 mineral acres | $7.4 million, or $550/acre | Plaintiff/ Gable |
| June 12, 1979 | Harlan County Land Co. to Florida Power and Light | Harlan County, Ky. & Lee County Va. | 33,184 acres, 130 million tons | $18.5 million, or $557/acre | Plaintiff/ Greenwald & Pritchett |
| January 2, 1979 | Tennessee Land and Mining Co. to Koppers Inc. | Several Counties in Tennessee | 65,000 acres, 70 million tons | $20 million, or $307/acre | Plaintiff/ Pritchett and Defendant/ Lipscomb |
| December, 1977 | Carroll Co. to Shamrock Co. | West Virginia | 3,384 acres | $10 million, or $747/acre | Plaintiff/ Pritchett |
| June 15, 1977 | Cumberland Mineral Co. to Greenwood Land and Mining Co. | Laurel & McCreary Counties, Kentucky | 25,989± acres in mineral rights only | $1.5 million, or $57/acre | Defendant/ Lipscomb |
| May 10, 1976 | Peabody Coal Co. to Harlan Land Co. | Kentucky and Virginia | 33,569 acres, 150 million tons | $9.3 million, or $271/acre | Defendant/ Lipscomb |
| December 31, 1975 | Stearns Co. to Blue Diamond Investment Co. | McCreary County, Ky. | 24,855± mineral acres and 946± surface acres, 41 million tons | $4.8 million, or $554/acre | Defendant/ Lipscomb |

Defendant avers that the comparable sales approach is most applicable in this case because there are comparable sales to consider and because the parcel had no operating mines at the time or cash flow. Def. Reply Br. at 54. Plaintiff put on evidence relying on comparable sales and other methods, but

expressed no clear preference for any one approach.

Prior sales of the same land are the most persuasive evidence of fair market value. Unfortunately in this case that option is unavailable because the last sale of this particular property took place in 1937. What did take place close to the date of the taking were two sales between Stearns and the United States. Although sales between the same parties are not given the deference afforded to prior sales of the same land, they nonetheless deserve careful scrutiny, particularly because in this case they involve contiguous or nearly contiguous land.

The first of these two sales between Stearn's and the United States, a sale of 288 mineral acres for $160,000, took place in 1987 and is too remote in time and different in characteristics for the court to consider it comparable. The other sale is much closer to the mark. That sale took place in July, 1979, within 18 months of the taking in December, 1980, transferring 935 surface-only acres, 8,227 acres of mineral and surface land, and 7,060 mineral-only acres, for a total of 16,223, from Stearns to the United States for consideration of $7.4 million. Much like the original transaction in 1937, the purpose of this transaction was to set aside land for federal conservation and recreation areas, specifically for the Big South Fork National River Recreation Area. Presumably the government was interested in purchasing the land and mineral rights because large sections of it run alongside the banks of the river on both sides, providing an ideal way for the government to prevent development along long sections of the South Fork river.

Mr. Gable testified at trial that this transaction was entered into willingly. The land was originally part of the larger Stearns estate, which prior to 1975 amounted to roughly 200 square miles in Kentucky and Tennessee. As Mr. Gable discussed at trial, in 1975 Stearns began to sell off large parts of its land and mining operations, including large chunks to Blue Diamond Investment Company.

What appears to have happened is that the parties agreed to split off parts of the Stearns estate closest to the river for buffer zones and then also incorporate the 8,227 acre surface and mineral estate, a large compact area along the southern border of Kentucky, for the recreation area. The court notes that this land abuts the Stearns mineral estate, which is the subject of this dispute. Pl. Ex's. 80, 90. It is generally true that land on one side of the fence shares many similar characteristics with the land on the other side. This is certainly the case here.

The government objected to the use of this sale as a comparable alleging that the sale was forced under threat of condemnation. The court allowed the evidence of the sale to come in at trial and finds that the sale should be considered as it does not fall into category of forced transactions. A forced transaction is disfavored in comparable sales analysis as it destroys the basic premise of fair market value. Here, the government approached Stearns about buying the parcel. Mr. Gable testified that this property included parts of all 4 coal seams, but that it was unlikely that Stearns would mine it, mainly because of the area's scenic features and poor accessibility. Tr. Trans. at 419–20. Not having operated mines in the area since 1975 and, as part of an overall diversification strategy, Stearns was interested in selling. The terms of the sale do not support the notion that the sale was forced. To the contrary, the consideration Stearns received for the parcel is a substantial sum, more than twice what the government feels is just compensation for the subject property despite being smaller and less compact. The court would note that if the government were right and the sale was "forced", the logical result would be that the price actually undervalued the property. This would, of course, benefit plaintiff!

The court finds this sale to be probative evidence of the value of the subject property. The sale involved the same parties, contiguous land, and closeness in time. The fact that it was not sold as a mining property does not diminish its comparability for it is evident that Stearns would not have sold for much less than what it could have received if it had sold the parcel to a mining enterprise. Without question the fact that this land runs alongside the river banks secured a premium price for Stearns and the subject property

does not offer the same benefits. What the subject property does offer is similarly valuable: specifically proven coal reserves, accessible mines and good transportation access. No one disputes that the subject property has value.

Turning to a separate sale, Stearns sold a large parcel to Blue Diamond Investment Co. in 1975. Included in the sale were options to purchase additional Stearns lands over time. Blue Diamond exercised these options on September 18, 1979 and on March 18, 1981 and then in turn sold 7,500 coal acres of this land to the United States. The government paid Blue Diamond $4.7 million in October, 1982 and made this acquisition part of the Big South Fork River Recreation Area. In support of his position that the subject property was worth $20.1 million, Mr. Gable testified that the subject property had better access to mineable coal and more proven reserves than the Blue Diamond property sold to the government, which in his view was inferior because it had been extensively mined and had poor rail access. Tr. Trans. at 430–31.

This sale is also probative evidence of the value of the Stearns estate. Although the sale was between Blue Diamond and the government, the land was previously owned by Stearns and as Mr. Gable testified, Blue Diamond's decision to exercise the option was driven not by its desire to exploit the minerals but to flip the property to the United States for a quick profit. Tr. Trans. at 278. The land is similar to the subject property in the following ways: 1) it is located in the same county; 2) it has many of the same topographical characteristics; 3) the sale occurred within an acceptable time frame for comparable sales purposes; 4) and it had potential as a mineral-bearing property.

In analyzing the comparable sales testimony, the court was struck by the lack of agreement among the experts on what sales were comparable. Out of the numerous sales presented, only one sale was relied on by all three experts, that being the January 2, 1979 sale of 65,000 acres in Tennessee to Koppers Co. for $20 million. The purchaser estimated that the property contained 70 million tons of coal in reserve of low to high quality steam coal. It was an active mining property composed of independent mining contractors who sold their coal to Koppers who in turn sold it to the consumer. According to the government's expert, other minerals in addition to coal were included in the price. Of the $20 million price, the government attributed only $13.6 million for the 70 million ton coal reserve.

Applying the Koppers transaction to the subject property, there are several major distinctions, namely the number of acres, 65,000 acres in fee versus 47,000 primarily mineral acres, the amount of coal in reserve, 70 million tons versus 13–18 million, and the fee interest versus only mineral rights. These factors lead the court to believe that the Stearns property is not nearly as valuable as plaintiff claims it to be.

The other comparables relied on by plaintiff's experts also fail to persuade the court that the Stearns property is worth almost $20 million. Mr. Greenwald and Mr. Pritchett both relied on the June 1979 Harlan Land Co. and the June 1980 Smith Trust/High Top sale. Both of these properties are similar in size to Stearns' mineral estate but they were both sold in fee. In addition, the coal reserves on these two properties are substantially larger than the court's estimate for Stearns' property, 130 million tons for the Harlan Land Co., and 47 million tons for the Smith Trust sale.

Plaintiff's side offered comparable sales analysis relying on the testimony of Mr. Greenwald, Mr. Pritchett, and Mr. Gable. Taking into account these comparables and his own experience on the property, Mr. Greenwald estimated that the Stearns property would carry a price of $525 per acre, for a total of almost $18.8 million. Mr. Pritchett also concluded that the Stearns property was worth $525 per acre.

For the government, Mr. Lipscomb selected five property sales that sold at prices both higher and lower than his estimate for the subject property. This bracketing approach is commonly used to hone in on the proper amount. The closest reserve in terms of amount was conveyed in the June 1977 sale, where according to Mr. Lipscomb 29,485,000

recoverable tons lie in reserve, almost twice the amount of Stearns. The 1977, 1976, and 1975 sales are problematic however because in the court's view the time interval between these transactions and the taking is too great for meaningful comparison. In addition, the properties on the higher price end are very dissimilar in terms of the major source of value, namely the coal reserves. In addition, these sales involved the surface and subsurface rights whereas the subject property is solely a mineral estate. Based on these sales, Mr. Lipscomb concluded that the property's value based on comparable sales was $83.25 per acre, a total of $2,250,000. The court feels that this figure is not justified by the facts and that the Stearns property is more valuable in light of its attributes and the prevailing market at the time.

The court concludes from the comparable sales evidence that a strong market for coal-bearing properties existed in the period from 1975–1980. Negotiations for the sale of the subject property were held with numerous parties in the time leading up to the taking, although these discussions never materialized into a final sale. Furthermore, the Ramex lease is evidence that the Stearns property was valuable on the open market. The Ramex lease was executed no later than November 3, 1980 for mining rights on 8,300 acres of Stearns mineral estate. According to Mr. Gable, earned royalties were to be paid at the rate of 8 percent of the selling price, but never less than $2 per ton during the term of the lease. Pl.Ex. 97, Tr. Trans. 297.

The comparable sales previously mentioned support the court's determination that a $5 million award is just. The preponderance of the evidence suggests that the Stearns' property does not have as much coal in reserve as plaintiff has claimed and a lot less than the properties plaintiff cited as comparables. The coal was marketable but was not a consistent, premium grade that would fetch top dollar. A further deduction must be taken for the fact that as Mr. Gable testified, Stearns had not mined the property since 1975. The start-up costs of resuming active mining on the property by a lessee cannot be discounted. In addition, the court notes that Stearns mineral estate is not as valuable as it would have been if it was held in fee. The vast majority of acreage in the comparables offered to the court included surface and subsurface rights. The court finds that any reasonable buyer would offer a lower price for the mineral estate in light of the risk associated with the government's surface ownership.

### B. Discounted Cash Flow/Royalty Income Stream

#### 1. Income Capitalization

Another approach to valuing the Stearns' estate is the income capitalization approach. "This approach makes the basic assumption that the property's value is shown by the income realized from it and that the market value can be arrived at by studying the income flow from the property and determining the capital necessary to give this income." B. Gelin & W. Miller, The Federal Law of Eminent Domain, § 4.1 at 200, (1982). Given the fact that it is sometimes difficult to find precisely comparable mineral properties for appraisal, the capitalization of income approach is commonly used. *See Foster v. United States*, 2 Cl.Ct. 426, 448 (1983); *U.S. v. 103.38 Acres of Land*, 660 F.2d 208 (6th Cir.1981).

#### a. Coal Production

Using this method, the experts once again reported wide variations. For the government, Mr. Naumann concluded that the fair market value of the property was $3.4 million. For the plaintiff, Mr. Boyd pegged the value at $19.2 million and Mr. Pritchett at $17.2 million. In general, the experts took into account the following considerations: 1) production schedule; 2) coal quality and price; 3) estimated income streams considering administrative costs and associated overhead; and 4) finding the present value by using an appropriate discount rate.

Mr. Naumann and Mr. Boyd both performed comprehensive analyses of the property's income producing potential but came to different conclusions. For instance, Mr. Naumann concluded that it would take seven years to ramp-up to maximum production whereas Mr. Boyd predicted that the property could produce at full capacity within three

years. Boyd's projected production schedules were based in part on his opinion, after reviewing relevant market data, that demand for coal was very strong and this fact would accelerate the start-up phase. Boyd reported that national coal production was up 27% from 1975 to 1980, with local production up 56% in the same period. Boyd also mentioned that the number of mines in the region increased from 164 to 240.

The court finds that Mr. Naumann's estimate more closely reflects the actual ramp-up period for a mine of this type, as evidenced by the chart produced by Mr. Naumann showing the classic production models. Def. Ex. 78X. This chart compares the Boyd projection against estimates made by Mr. Naumann, Mr. Pritchett, and the historical production of the Justus Mine, which was operated by Stearns prior to 1975 and then by Blue Diamond. From looking at the chart it is clear that Mr. Boyd and Mr. Pritchett are overly optimistic and their projections run counter to the classic production models in the industry. Mr. Boyd's claims are further eroded by the fact that this property had not been actively mined since 1975, indicating that resumption of full capacity would take considerable time and effort. In addition, whereas Mr. Boyd projects a constant recovery of 1.2 million tons per year from year 3 into the foreseeable future, the historical mining records of the Stearns Company itself show a great variation from year to year in the actual recovery of coal.

### b. Coal Market and Quality

In determining a likely price per ton for the coal, the quality of the coal and market conditions are the key factors. The parties did not agree on the quality of the coal or the appropriate price per ton. Mr. Naumann cited the fact that it was customary in the industry to "higrade" the property, meaning that the best coal is taken out first, and that the Stearns property was no exception. Under this theory, the remaining reserve would have to be of a lesser grade and thus less valuable. Mr. Naumann testified that the remaining coal was marketable but not a premium grade. He said that the coal was medium-to-high sulfur with high-ash content. Mr. Boyd on the other hand testified that the

coal was of a premium grade, taking into account ash content, BTU's, and sulfur. Both experts agreed that there was limited historical coal quality data available. Mr. Boyd relied on analytic data available in various company files, public records, and personal knowledge about the number 3 seam and the Blue Diamond mining operation. Mr. Boyd testified that the BTU rating for Stearns coal would place it in the top 20 percent making its coal highly marketable.

The government makes much of the affect on coal prices of new source performance standards related to clean air requirements. While Mr. Boyd concedes that the Stearns coal is not low-sulfur, he found that this characteristic had no adverse impact on the market for coal. Based on data from the Federal Energy Regulation Commission, Mr. Boyd reported that 176 million tons of coal with sulfur content in excess of two percent and a composite BTU of 11,355, lower than the BTU rating for Stearns' coal, were sold to steam electric plants in 1980. Tr. Trans. at 1110.

The court finds Mr. Boyd's testimony about the strong market for coal comparable to Stearns' persuasive. Even if Stearns' coal is not uniformly premium, and the evidence clearly shows that it is not, the market for medium-grade coal was strong nonetheless. National coal production was up, local production was up significantly, and there were many more mines operating in the region than in the 5–year period prior to the taking in 1980.

### c. Coal Price

Both Mr. Naumann and Mr. Boyd concluded that the Stearns property could be mined profitably. Pl. Br. at 65, Def. Br. at 65. They disagreed however on the price at which Stearns' coal would have sold on the market, with Mr. Naumann settling on $25.28 per ton, Mr. Boyd at $26.80 per ton and Mr. Pritchett at an even $26.00 per ton. The court has previously confronted this issue in a related case. See Whitney Benefits v. United States, 18 Cl.Ct. 394 (1989). In that case, the court called for an inquiry into local market conditions and factors unique to the subject property to determine the appropri-

ate price, in addition to considering industry publications such as Coal Week.[10]

As previously stated, price is affected by many factors, including coal reserve quality, proximity to intended market, and transportation access. Mr. Pritchett's estimate, which falls almost exactly between the other two estimates, was based solely on data from the Statistical Abstract of the United States. While this general reference book is perhaps a good start, reliance on such a generalized reference book is disfavored as it tends to lump all coal into the same category when common sense and the record shows that the price of coal, like any product, varies from region to region, and even within the region.

Although Mr. Boyd's testimony was credible, his search, while more extensive than Mr. Pritchett's, did not go far enough. He relied on data from FERC, Coal Week, and Coal Week data specific to District 8.[11] Mr. Boyd found that the f.o.b. mine coal prices increased from 1975 to 1980. His coal price assumptions include a price of $24.00 for spot coal and $27.50 for contract coal.[12] Based on these figures, he projected that Stearns' coal was worth a price of $26.80 per ton.

Mr. Naumann's extensive inquiry into local markets and local sales resulted in specific information that gives the court a more definite picture of the local and regional market. As part of his analysis, Mr. Naumann reviewed market-place transactions involving actual coal shipments to electric utility plants in the years 1978, 1979, and 1980. Def. Ex. 3, Tables 26 and 27. As this court has said, market place transactions are the next best evidence of price as a back stop to price quotations in trade journals. *Whitney Benefits*, 18 Cl.Ct. at 411. The review included coal purchased by electric utilities in Kentucky, Tennessee, Georgia, South Carolina, Indiana, Ohio, Florida, and Alabama. The coal originated in eastern and western Kentucky, Tennessee, West Virginia, Virginia,

Pennsylvania, Ohio, Illinois, and Indiana. After sorting all of these transactions by location of purchaser, transportation method, shipment location, and quality, Mr. Naumann came up with a weighted average by state for both medium– and high-sulfur coal. In Kentucky, the weighted average price for high-sulfur coal for the year 1980 was $24.38 per ton, in Ohio it was $27.11, in Indiana it was $23.86. In Kentucky the weighted average for medium-sulfur coal in the year 1980 was $30.81 per ton, in Georgia it was $34.82, in South Carolina it was $39.62 per ton, in Florida it was $48.35 per ton, in Alabama it was $35.93 per ton.

This data supports Mr. Naumann's conclusion that the Stearns coal would receive a price of $25.28 per ton. As previously discussed, it is more likely based on the evidence that the remaining Stearns reserve is largely composed of high-sulfur coal, thus reducing the average price. The court also concurs with Mr. Naumann's use of electric utility purchases as a measure of analysis because the largest single market for the Stearns coal would have been utilities. Based on Mr. Naumann's extensive analysis of completed sales and prevailing market conditions, the court accepts his findings on the issue of price as his approach strikes the court as more reasonable and factually-based than reliance on general reference books and trade journal publications.

#### d. The Discount Rate

Once again the experts disagreed. Defendant's expert Mr. Naumann applied a discount rate of 21.5 percent in its analysis of the fair market value. As Mr. Naumann notes in his report, the discount rate is a function of several identifiable risk factors. Def. Ex. 3, Page 45–6. Mr. Naumann's discount rate began with the risk-free rate (11.3%), and then added an equity risk premium (1.3%), a risk premium for small size (7.5%), additional coal industry risk (9.5%), resulting in a total risk factor of 29.6% which

---

**10.** Coal Week, a weekly trade publication published by McGraw–Hill, Inc., reports regional "marker" steam coal prices on a bi-weekly basis.

**11.** Coal Week District 8 encompasses southern West Virginia, eastern Kentucky, northern Tennessee, and Virginia.

**12.** Markets for coal fall into four categories: *utility contract* for long-term contracts with utilities; *utility spot* for utility steam coal on a short-term or spot basis; *industrial-rom* for large scale industrial users; and *industrial-sized* for smaller-scaled industrial or institutional customers.

he discounted to 21.5% after adjusting for inflation. Mr. Naumann attributed the surprisingly high number to inflationary times of the late 1970's and 1980's, the high cost of debt, and the high level of risk associated with this property. Def. Br. at 70.

The Boyd Company discount rate of 11.25% was based on the fact that the rate generally applied in the coal industry during that period was between 8–12% and on the Bureau of Land Management's Economic Evaluation of Coal Properties guidelines that call for 10% in cases involving operating cash flow. Since royalty income valuation is less risky than operating cash flow, plaintiff asserts that Mr. Boyd's rate is conservative. Pl. Br. at 70. In addition, plaintiff points to Mr. Shober's testimony to confirm that a 10% discount rate was commonly used by land holding companies for valuation purposes. Pl. Br. at 70.

Mr. Naumann's discount rate approach strikes the court as overly cautious. Although coal mining techniques are well-developed, defendant views the activity as inherently risky, not in the sense of worker safety although it can be (as recent events in Pennsylvania demonstrate), but with regard to the risk of exploration, market conditions, and capital costs. Like the airplane, coal mining was once a very risky proposition, but with modern advances and proper procedures, flying airplanes, and coal mining, can be done within acceptable risks. More important, the higher risk Mr. Naumann attributes to the property, true or not, is more properly reflected in the amount a buyer is willing to pay for the parcel. As stated in the BLM appraisal guide, *"In general, the use of a discount rate adjustment to account for risk is not recommended because of the overwhelming subjectivity involved in selecting the risk premium."* BLM Appraisal Guide at 52 (emphasis added).

By comparison, in the *Whitney Benefits* case, the government urged the court to adopt a discount rate of 12.5% for events that took place in 1977, just three years before the taking here. But in the instant case, the defendant urges the court to approve a rate almost double the one advanced in Whitney Benefits. *Whitney Benefits*, 18 Cl.Ct. at 412.

The court fails to see how Mr. Naumann's rate is justifiable and adopts the rate advanced by Mr. Boyd.

### e. Costs

Both parties factored in the costs associated with such a venture, but to differing degrees. Defendant included contractor fees, mine development costs, Black Lung taxes, Kentucky severance taxes and reclamation costs, administrative costs, sales commissions and fees and lessee's sales and related costs. Def. Br. at 65. Plaintiff deducted 5% for administrative costs that would be incurred by the lessor, which he defined as a way to deduct a fair expense from the gross royalty income that would not go to profit. Tr. Trans. at 1156.

Defendant's analysis is clearly more comprehensive. The question is whether it is customary in the coal industry to take into account such expenses when estimating the fair market value. In *Whitney Benefits*, the court adopted in large part a plan prepared by the Boyd Co. that considered operating and capital costs when establishing fair market value. *Whitney Benefits*, 18 Cl.Ct. at 413. Ironically, in this case the Boyd Co. did not provide the same type of thorough analysis. Nevertheless, the court believes that a potential buyer of property takes into account capital and operating costs associated with buying and selling properties, particularly commercial properties, and thus the court adopts Mr. Naumann's findings in this regard.

All parties agreed that the applicable royalty rate was eight percent.

### f. Taxes

The court believes that the fair market value of the property should be established on a pre-tax basis. *See Hughes Aircraft Co. v. United States*, 31 Fed.Cl. 464 (1994), aff'd, 86 F.3d 1566 (Fed.Cir.1996). In an arms-length transaction the seller's tax obligation remains the same regardless of who buys the property but the buyer's tax status is a question as to corporate form. Valuing property on an after-tax basis wrongly places the burden of the buyer's status on the seller.

### g. Interest, Attorneys Fees & Costs

■ It is well-established that where the government pays just compensation after a taking the owner is entitled to interest on the award. *See Kirby Forest Indus. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Without this award, the owner would not be placed in the same financial position as if the taking had not occurred. 28 U.S.C. § 2516(a) (1994 & Supp.2002.); *see also United States v. Alcea Band of Tilla-mooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951). Thus, Stearns is awarded compound pre-judgment interest from the date of this taking, December 3, 1980, to the date of the judgment. *See United States v. Thayer–West Point Hotel Co.*, 329 U.S. 585, 588, 107 Ct.Cl. 714, 67 S.Ct. 398, 91 L.Ed. 521 (1947); *Miller v. United States*, 223 Ct.Cl. 352, 360, 620 F.2d 812 (1980).

As has been the practice of this court, the interest computation shall be based on the Contracts Disputes Act, 41 U.S.C. § 601–613 (1982). *See Jones v. United States*, 3 Cl.Ct. 4, 7 (1983).

### V. Damages Summary

When Stearns lost its property right it was clearly damaged, but it has not persuaded the court that its damage award should fall into the $17–20 million range. By the same token, the government has underestimated the value of the Stearns estate. Based on the characteristics of the Stearns property previously discussed, specifically amount and quality of coal in reserve, acreage, and other features of the land, the court believes that what was taken from Stearns had a fair market value of $5 million. Although the fair market value cannot be determined with exactitude, the court believes it has reached an amount that is just and as exact as can be determined in light of all available evidence. Clearly we can never know what a hypothetical purchaser who never existed would have paid for a property not sold over 20 years in the past. However, justice demands the court make its best decision on the preponderance of the evidence, and this the court has done.

In assigning fair market value, the royalty income stream should generally provide a similar result as other valuation methods. Here the court feels that its $5 million dollar award is supported by its royalty income stream analysis. The major income producing factors in a mineral estate are the amount and quality of the coal. Here the Stearns estate could have yielded millions of tons of coal for many years at a profit. Several key elements of the government's analysis were more credible to the court, including its production schedule, coal price analysis, and costs. Plaintiff also convinced the court on several points, including that a viable market for Stearns' coal existed, the amount of the applicable discount rate, and that the estate should be valued on a pre-tax basis. These findings support the court's damage award.

### CONCLUSION

The court thus concludes that the government's action effected a taking of plaintiff's property and that just compensation is warranted under the Fifth Amendment. The court awards plaintiff $5 million in compensation, plus compound interest from December 3, 1980, attorney fees and costs under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. 42 U.S.C. § 4601 *et seq.* (1995 & 2002 Supp.)

**IT IS SO ORDERED.**