**BASSETT, NEW MEXICO LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–568L.

United States Court of Federal Claims.

Dec. 27, 2002.

Roger J. Marzulla & Nancie G. Marzulla, Marzulla & Marzulla, Washington, D.C., for plaintiff.

Susan V. Cook & David W. Spohr, General Litigation Section, Environment & Natural Resource Division, U.S. Department of Justice, Washington, D.C., with whom were Lois J. Schiffer, Assistant Attorney General, for defendant. Robert Maher, Environmental Enforcement Section, Environment & Natural Resources Division, U.S. Department of Justice, of counsel.

## OPINION

SMITH, Senior Judge.

This matter is before the Court on Plaintiff's claim for just compensation under the Fifth Amendment for the physical taking of real property, and Defendant's pending Motion to Dismiss for failure to state a claim upon which relief may be granted under Rules of the Court of Federal Claims ("RCFC") 12(b)(6) and lack of jurisdiction over the subject matter under RCFC 12(b)(1). The taking arises from the federal government's deposit of large quantities of hazardous waste into Plaintiff's quarry (the "removal action") pursuant to action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601–9675 (2002).

The United States has conceded liability for the physical taking of the subject property. This opinion therefore focuses on ascertaining Plaintiff's damages award. An initial jurisdictional question before the Court concerns our right to decide CERCLA liability claims. As a function of determining the just compensation owed to Plaintiff, we consider whether Plaintiff held access to the subject property under the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1782 (1976), whether the removal action constituted a special benefit to Plaintiff that we should deduct from any damages award, and whether we may award compensation for damages proximately caused by the physical taking at issue, including damages such as stigmatic injury and potential CERCLA liability. We issue the following opinion after a trial with a site visit, thorough oral argument, as well as briefing of the matter.

## FACTS

Plaintiff, Bassett, New Mexico LLC, purchased 68.84 acres of improved real property (the "Property") located in the State of New Mexico (the "State") in December 1994 from John Stowe. The Property contains large quantities of limestone suitable for use as aggregate,[1] and four patented mining claims collectively known as the Stephenson–Bennett Mine (the "Mine"). The four patented mining claims include the Bennett, San Augustin, Stephenson East, and McClellan Lodes.

From roughly the late nineteenth until the mid-twentieth century, the owners of the Property had conducted large-scale mining operations, leaving piles of mining waste on

---

1. "Aggregate" refers to miscellaneous soil and rock suitable for the production of concrete.

the Property. Much of the earliest mining was done beginning on the open face of exposed ores. This upland exposed cliff area had also been, according to testimony, eroded over thousands of years, with some of the minerals having washed down into the downslope area off of the Property. On the site visit the Court noted the crumbly character of some of this ore. Thus, when Bassett agreed to purchase the Property, he obtained an assessment from the New Mexico Environmental Department (the "Department") under agreement with the Environmental Protection Agency (the "EPA") for possible environmental problems caused by the waste. The assessment noted that hazardous waste contaminating the area represented a potential risk to human inhabitants of the Property, but concluded that the Property would not require remedial action by the EPA because of the low probability of prolonged exposure of people or wildlife to the waste. However, in 1996, the Department discovered lead poisoning in both residents and animals residing downslope from the Property. The Department therefore requested assistance from the EPA to investigate the Property and areas adjacent to the property.

The EPA responded to the Department's request by conducting an environmental assessment of a 150–acre area (the "Area") comprising federal, state, and private land, including the Property. The EPA identified portions of the Area containing hazardous levels of lead, arsenic, and zinc. In particular, the EPA found lead and arsenic contamination on the Bennett and San Augustin Lodes. The EPA thereafter subjected the Area to a "removal action" pursuant to CERCLA. Under CERCLA, a removal action includes the cleanup of waste releasing or threatening to release hazardous contaminants. 42 U.S.C. § 9601 (2002). The cleanup of the Area included the excavation and transportation of contaminated soil and rock from the Property, from the downslope property owned by the State and the United States, and from private land associated with 69 residences, between October 6, 1997, and November 7, 1998. The EPA sealed the contaminated material excavated from the Area in a previously-contaminated limestone quarry (the "Quarry") located on the Bennett Lode in the mistaken belief that Bassett had consented to the deposition of the material. The waste repository thereby created by the EPA ultimately occupied three acres of the Property, filling the existing quarry.

On July 9, 1998, Bassett filed suit against the United States in this Court seeking just compensation for the physical taking of the Property by the EPA under the Fifth Amendment of the Constitution. On February 10, 1999, Plaintiff filed a motion for summary judgment on liability. In the motion, Plaintiff argued that the EPA's action constituted a taking of the entire Property.

After Plaintiff filed its motion, on May 20, 1999, the EPA sent Plaintiff a letter asserting that the contaminated soil which the EPA had placed in the Quarry had originated from mining operations on the Property. The letter further alleged that the EPA could hold Bassett liable for the cost of the EPA's removal action under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) as the present owner of property from which hazardous substances had been released. The letter included a draft judicial consent decree prepared for filing in the United States District Court for the District of New Mexico. The consent decree committed Bassett to pay $5,251,377.58 in costs stemming from the removal action, bear all future liability for the release of hazardous substances from the Property, including waste emplaced in the Quarry during the removal action, and relinquish all claims for just compensation under the Fifth Amendment based on the removal action. Bassett refused to sign the consent decree.

Despite this failure to agree on a consent decree, the United States and Plaintiff filed a joint stipulation of liability on May 24, 1999. The United States conceded in the joint stipulation that the EPA's removal action resulted in the physical taking of "at least" the Quarry, but did not concede liability to the taking of any other property.

On June 11, 1999, Bassett moved to amend its complaint to address the possibility of additional damages posed by the EPA's May 20, 1999, letter. In the motion, Plaintiff characterized the CERCLA liability men-

tioned in the letter as additional damages stemming from the physical taking of the Quarry and as an unconstitutional imposition of retroactive liability. After oral argument on February 15, 2000, this Court granted Plaintiff's motion to amend the complaint. Thus, the matter before this Court encompasses both the physical taking of the Property and the related question of whether Plaintiff deserves just compensation for the CERCLA liability that the EPA seeks to impose. Nevertheless, on April 6, 2000, the United States filed a pending Motion to Dismiss the amended complaint on two grounds: our jurisdiction to try CERCLA claims, and Plaintiff's failure to state a claim upon which relief may be granted due to the constitutionality of retroactive liability under CERCLA.

The Court held trial on damages stemming from the taking in January and April of 2000, and heard closing arguments in November. Plaintiff argued that it had a right of access to the Property from public roads under federal and state law. Plaintiff presented evidence that such access would permit the commercial exploitation of the Property for its highest and best use and estimated the pre-removal action value of the Property as $3,555,000. Plaintiff further argued that value of the Property after the removal action was –$89,251,000 due to the specter of CERCLA liability. Thus, Plaintiff concluded that the United States owed Bassett $92,806,000 in damages.

On the other hand, the United States argued that the Property lacked access to a public road necessary to support the highest and best use of the Property before the EPA filled the Quarry with the material, the removal action. The United States also presented evidence that the Property's pre-removal action value was actually $36,150.00, and post-removal value was $34,600. In assessing the post-removal action value of the Property, the United States reasoned that the only part of the Property adversely affected by the removal action were the three acres which served as a repository for contaminants. Thus, according to the United States, Bassett deserved compensation of $1,550.00 only for the taking of the Quarry.

## DISCUSSION

The Court considers the instant case in two parts. First, we examine the threshold question of our jurisdiction over Plaintiff's claim. This includes evaluating the United States' pending Motion to Dismiss. Second, given that the United States has conceded liability to the physical taking of the Quarry, the Court measures the damages due Plaintiff in just compensation as a result of the removal action.

### I.  JURISDICTION

This case raises two questions concerning the Court's jurisdiction: jurisdiction over the physical taking of Bassett's property by the removal action, and jurisdiction over the amended portion of Plaintiff's claim concerning damages resulting from the alleged taking of the Property through the government's threat of CERCLA liability.

### A.  The Physical Taking—The Removal Action

The Tucker Act grants this Court jurisdiction to entertain any suit for money against the United States which does not sound in tort and which is founded upon the Constitution. 28 U.S.C. § 1491 (1988). The Takings Clause of the Fifth Amendment of the Constitution prohibits the United States government from taking private property for public use without "just compensation." U.S. CONST. amend. V. A compensable taking of property occurs when society imposes a burden on an individual's property which, in fairness and justice, society itself should bear. *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

To state a valid takings claim under the Fifth Amendment, a plaintiff must allege that the federal government has divested the plaintiff of a legally cognizable property interest without justly compensating the plaintiff for that divestment. *Allred v. United States,* 33 Fed.Cl. 349, 355 (1995). Such divestment may occur through both physical and regulatory means. A physical taking occurs when the government encroaches upon or occupies private land. *See, e.g., Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). On the

other hand, a regulatory taking consists of government action that deprives a plaintiff of a property interest without involving the physical encroachment upon or occupation of private property. *Pax Christi Memorial Gardens v. United States*, 52 Fed.Cl. 318, 319 n. 1 (2002). We assert jurisdiction over the portion of Plaintiff's claim directly concerning the removal action because Plaintiff alleges, and the United States concedes, that the EPA's removal action constituted an uncompensated physical taking of Bassett's property.

B. The Regulatory Taking—CERCLA Liability (The United States' Motion to Dismiss)

■ We next address our jurisdiction over the portion of Plaintiff's claim concerning the government's threat of CERCLA liability. This Court permitted the amendment of Plaintiff's claim to include consideration of the CERCLA liability as additional damages stemming from the physical taking of Bassett's property.[2] *See Bassett, New Mexico LLC v. United States*, 46 Fed.Cl. 393, 394–95 (2000). However, the United States' pending Motion to Dismiss argues that we should dismiss the amended portion of Plaintiff's claim on two grounds. First, the United States claims that we lack subject matter jurisdiction under RCFC 12(b)(1) to construe Plaintiff's CERCLA claim. Second, the government argues that Plaintiff fails to state a claim for which relief may be granted under RCFC 12(b)(6) because, contrary to Plaintiff's Motion for Leave to Amend Complaint, a CERCLA liability claim against Plaintiff does not constitute an unconstitutional exercise of retroactive liability.

We deny the United States' Motion to Dismiss. In the Motion, the United States claims that United States District Courts have sole and exclusive jurisdiction over determinations of CERCLA liability. We agree with the United States that this Court does not have jurisdiction over the adjudication of CERCLA claims, per se; CERCLA

plainly dictates that "the United States district courts shall have exclusive jurisdiction over all controversies under [CERCLA]." CERCLA, 42 U.S.C. § 9613(b) (2002). The Court therefore leaves the issue of whether Plaintiff may be held liable for the cost of the removal action, including whether CERCLA liability is an improper imposition of retroactive liability, to the federal District Courts.

However, as previously discussed, we hold exclusive jurisdiction over Bassett's claim with respect to the physical taking at issue, including all damages produced by the physical taking. Here, the question is open as to whether potential CERCLA liability arises because of the removal action which caused the physical taking of Plaintiff's property. If Plaintiff is liable for the cost of the removal action under CERCLA because the EPA deposited waste in the Quarry, then the liability represents an additional source of damages generated by the physical taking of the Property. It follows that the Court holds jurisdiction over the question of whether any CERCLA liability incurred by Bassett is an inherent part of the damages to be awarded in just compensation for the Property's taking. *See* U.S. CONST. amend. V; Tucker Act, 28 U.S.C. § 1491 (1988). We therefore deny the United States' Motion to Dismiss under 12(b)(1). The Court need not reach the government's alternative grounds for dismissal under 12(b)(6) because the issue of whether CERCLA liability in the instant case is constitutional as an example of retroactive liability properly belongs to the United States District Courts.

RCFC 54(b) permits the Court to enter partial judgment in a matter when "more than one claim for relief is presented in an action" and "there is no just reason for delay" with respect to the entry of final judgment in one or more, but not all of the claims. Two undecided factual determinations prevent us from entering final judgment with respect to the amount of damages owed to Plaintiff as part of Plaintiff's CERC-

---

2. As the Court stated in its opinion permitting the amendment, "plaintiff's amendment describes newly alleged damage from the physical taking already conceded by the defendant... damages and just compensation are broad con-

cepts...[i]t is in the interests of justice to allow for liberal amendment generally in order to facilitate the resolution of all properly related claims for relief." *Bassett, New Mexico LLC v. United States*, 46 Fed.Cl. 393, 394–95 (2000).

LA liability claim. First, the exact amount of damages resulting from CERCLA liability is unclear. Not only has there been no determination as to the amount of CERCLA liability at issue, but the United States has not even filed suit against Bassett to recover the cost of the removal action. Second, we have not determined whether the removal action gives rise to CERCLA liability because there is currently no determination of CERCLA liability on Bassett's part by a United States District Court.

However, that portion of damages in the instant case directly attributable to the physical taking of the Property is currently calculable. Therefore, under RCFC 54(b) we enter partial judgment in this matter by deciding only the presently calculable portion of Plaintiff's just compensation in the interest of the efficient administration of justice. We stay the remainder of this case related to Plaintiff's CERCLA liability claim until such time as a United States District Court has ascertained the exact amount of Plaintiff's CERCLA liability, if any. At such time as the Court knows the exact amount of the CERCLA liability, we will hold further proceedings to determine if the CERCLA liability resulted from the EPA's removal action, and thereby assess any additional damages recovery due Plaintiff.

## II. DAMAGES

### A. Just Compensation

▮ Having answered the threshold questions addressed above, the Court is left with the task of evaluating the damages owed Bassett from the EPA's removal action. Just compensation requires that the government remunerate a deprived property owner so as to place the property owner in as good a position pecuniarily as if the government had not taken his property. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 176–77, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) (quoting *United States v. Miller*, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943)); *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). Restoring the deprived property owner's pretaking financial position involves compensating the property owner for the fair market value of the property lost as a result of the taking. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (internal citations omitted). Fair market value is "[t]he price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *see also Yancey v. United States*, 915 F.2d 1534, 1542 (Fed.Cir.1990). A property owner is entitled to have the fair market value of his property determined by his property's highest and best use before the taking. *Stearns Co., Ltd. v. United States*, 53 Fed.Cl. 446, 455 (2002) (citing *Olson v. United States*, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).

Highest and best use is "[t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 156 (1990) (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 269 (9th ed.1987)). Valuation of highest and best use "may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted." *Id.* (quoting *United States v. Powelson*, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943)).

Here, both parties agree that given sufficient access, the highest and best use of the Property before the removal action included aggregate mining, residential development, and water sales. Assessing compensable damages in the instant case requires the Court to measure the degree to which the removal action deprived Plaintiff of the value of each use constituting the overall highest and best use of the Property before the removal action. The sum of these measurements is the just compensation for the taking. In order to determine damages in this case, the Court must resolve three related issues. First, we must determine if access to the Property sufficient to allow Plaintiff to realize the Property's highest and best use

existed or could realistically be secured prior to the taking. Second, we must measure the extent of the United States' taking of Plaintiff's property; i.e., whether the taking is limited to the EPA's physical intrusion onto the Quarry, as the United States contends, or had compensable effects on the entire Property's marketability because of the stigmatic effect of CERCLA liability, as Plaintiff argues. Finally, the Court examines the United States' argument that the removal action conferred a special benefit upon the Property which we should use to offset damages resulting from the taking.

### 1. *Access*

The question of whether Plaintiff could have gained access to the Property is basic to assessing compensable damages in the instant case. We cannot compensate Plaintiff for damages to the commercial development potential of the Property if limited access to the Property prohibited the realization of that potential. Thus, if the Court finds that Bassett *could have* gained access rights to the Property, then the Court's calculation of the damages resulting from the taking should include the Property's potential mining, residential development, and water rights value. *See Loveladies Harbor, Inc.*, 21 Cl.Ct. at 156 (holding that highest and best use valuation "may reflect not only the use to which property is presently devoted but also that use to which it may be readily converted" (internal citation omitted)). On the other hand, if we find that Plaintiff could not have gained access rights, then our computation should not incorporate the full value of these commercial possibilities.

The following facts are relevant to our determination of Bassett's access rights to the Property. The Property is surrounded by a Wilderness Study Area ("WSA"), known as the New Organ WSA. A WSA is a roadless area of 5,000 acres or more protected as undeveloped wilderness under the FLPMA. 43 U.S.C. §§ 1701–1782 (1976).[3] A public road, the Baylor Canyon Road, bounds the New Organ WSA to the north, and then stretches to south and west of the WSA. To the immediate west of the WSA, adjacent to the Baylor Canyon Road, lies state and private property. A right-of-way, the Cherry Stem Road (the "Road") runs west from the Property through the WSA, the state land, and private property, thus connecting the Property to the Baylor Canyon Road. The Road was exempted from the general prohibition on roads in a WSA.

In 1983, the owners of private property situated astride the Road blocked the Mundys, the then-owners of the Property, from crossing that part of the Road which traversed their property. The Mundys consequently applied to the State for an alternate route leading from Baylor Canyon Road across State land to the Property which avoided the inaccessible private property. On November 15, 1983, the Mundys sold the Property to John Stowe. The contract for the sale of the Property warranted that the Property had "full and complete, unimpeded access from the public highways." However, the Mundys did not receive permission from the State to use the requested alternate route until after the date of sale of the Property. On September 22, 1988, the State advised Stowe that the contract for sale of the Property from the Mundys to Stowe could not have conveyed the power to use the alternate route since the sale of the Property pre-dated the State's permission for the Mundys to use the alternate route.

After acquiring the Property from Stowe, Bassett requested the State to assign Bassett the rights to the alternate route. On February 16, 1998, the State denied Plaintiff's request, noting that "this easement has been declared abandoned due to non-use and is not an active file." On April 15, 1998, Bassett notified the State of his intent to conduct

---

**3.** The FLPMA requires the Secretary of the Interior to establish WSA's. Under the statute, the Department of the Interior uses a "wilderness inventory" process to identify those roadless areas of 5,000 acres or more and those roadless islands that manifest specified wilderness characteristics. The Department of the Interior subsequently designates areas identified as exhibiting these characteristics as WSA's. The statute requires the Secretary of the Interior to identify and protect WSA's pending executive decisions as to whether to accept WSA's into the Federal Wilderness Preservation System. The Bureau of Land Management, an agency within the Department of the Interior responsible for the administration of public lands, supervises WSA's.

a survey of a new alternate route which would lead from Baylor Canyon Road to the Road through State land without crossing private property. However, on April 25, 1998, the State denied Plaintiff's request to conduct a survey, noting that the proposed route was not "in the best interest of the [State]." Plaintiff never formally applied to the Bureau of Land Management (the "BLM") for an alternate thruway to the Property which would cleave directly through the New Organ WSA to the Property from Baylor Canyon Road without crossing otherwise impassable State or private property.

Thus, prior to the taking, Plaintiff lacked access to the Property from public roads sufficient to permit full commercial exploitation of the Property for the Property's highest and best uses. In summary, although the Bureau guaranteed Plaintiff passage to the Property over the federally-governed New Organ WSA via the Road, private property owners blocked complete thruway to the Property from the Baylor Canyon Road. Moreover, the State refused Bassett both the right to use the Mundys' alternate route, which bypassed the portion of the Road blocked by private property owners, and the right to survey a new easement through State land. Consequently, Plaintiff lacked an easement leading from the Baylor Canyon Road that would lead to the Road through State and private property. This leaves open the question whether Plaintiff could have procured access to the Property through other means.

At trial and in its briefs, Plaintiff presented various theories regarding how Plaintiff could have gained right-of-way to the Property. The Court need not address each theory. Rather, we agree with Plaintiff that the BLM's interpretation of the FLPMA would

have required the BLM to provide Plaintiff with said access.

The FLPMA sets standards for the management of land falling under BLM jurisdiction. It contains no explicit provisions concerning access to private property through WSA's. However, Section 1782(c) of the FLPMA requires the Secretary of the Interior and, by implicit extension, the Bureau, as an agency under the Department of Interior, to manage WSA's "so as not to impair the suitability of such areas for preservation as wilderness" until Congress acts either to designate a WSA as wilderness, or to release it from wilderness study. 43 U.S.C. § 1782(c) (2002). Section 1782(a) of the FLPMA requires that wilderness areas be "roadless."[4] 43 U.S.C. § 1782(a). An initial reading of these two FLPMA sections suggests that the existence of a road in a designated wilderness area impairs that area's suitability for preservation as wilderness within the meaning of the FLPMA.

Nonetheless, Congress also provided protection to rights-of-way under 43 U.S.C. § 1769(a) (2002)[5] and in the Savings Provisions listed under 43 U.S.C. § 1701 (2002).[6] Congress further showed its concern for the rights of property holders by permitting "existing mining and grazing uses and mineral leasing in the manner and degree to which the same was being conducted on October 21, 1976," the date of the FLPMA's establishment. 43 U.S.C. § 1782(a) (2002).

The statute is therefore ambiguous. The FLPMA does not clarify how the provisions safeguarding access under § 1769 and § 1701 interact with the non-impairment mandate under § 1782(c). The BLM's Interim Management Policy for Lands Under Wilderness Review ("Interim Management Policy") resolves the resultant ambiguity by interpreting the FLPMA to mean that: "[t]he BLM is

---

4. Regulations define a "roadless area" as "a reasonably compact area of undeveloped Federal land which possesses the general characteristics of a wilderness and within which there is no *improved road that is suitable for public travel by means of four-wheeled, motorized vehicles intended primarily for highway use.*" 43 C.F.R. § 19.2(e) (2002).

5. Section 1769(a) states that, "[n]othing in this subchapter shall have the effect of terminating

any right-of-way or right-of-use heretofore issued." 43 U.S.C. § 1769(a) (2002).

6. Savings Provision (a) protects "any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval" of the FLPMA. 43 U.S.C. § 1701 (2002). "Savings Provision (h) states that, [a]ll actions by the Secretary concerned under this Act shall be subject to valid existing rights." 43 U.S.C. § 1701 (2002).

required by law to provide such access as is adequate to secure to the landowner the reasonable use and enjoyment of non-Federally owned land which is completely surrounded or isolated by public lands administered under FLPMA." BLM, Manual H–8550–1, Interim Management Policy 30 (1995). This requirement specifically applies "[i]n cases of access to non-Federal lands where the ... application of the nonimpairment [sic] standard would unreasonably interfere with the enjoyment of the landowner's rights." *Id.*

In view of the Interim Management Policy's construction of the FLPMA, the BLM could have provided Plaintiff with sufficient access to the Property to allow Plaintiff to develop the Property for residential and commercial water use if Plaintiff had applied for an alternate right-of-way. The United States has never questioned the reasonableness of the potential use of the Property for such purposes; it merely noted that Plaintiff lacked access to the Property. Given that residential development and commercial water use typically constitute a "reasonable use and enjoyment" of private Property, and lacking the provision of alternate access, the literal application of the statutory non-impairment standard would have unreasonably interfered with Bassett's rights as the Property's owner.

The Interim Management Policy further interprets the FLPMA to mean that the BLM may grant access to mining claims even if such access would result in the impairment of a wilderness area. *Id.* at 30–31. One situation in which the Interim Management Policy allows the BLM to grant access is where "the BLM has determined that application of the nonimpairment [sic] standard would unreasonably interfere with development of the claim" where the mining claim in question had a valid discovery date as of October 21, 1976.[7] *Id.* In the instant case, the mines located on the Property actively operated prior to October 21, 1976, and thus presumably enjoyed a valid discovery preced-

ing this date.[8] Consequently, the Interim Management Policy interpretation of the FLPMA would have permitted the BLM to provide Plaintiff with alternate access which would have avoided Plaintiff's current access difficulties by circumnavigating non-federal land in providing a direct route through the New Organ WSA to the Property.

■ According to the Supreme Court, when courts review an agency regulation's interpretation of the statute which that agency administers, if the statute is ambiguous with respect to the specific question before the court, the court must ask "whether the agency's answer is based on a permissible construction of the statute." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In doing so, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction." *Id.* Thus, courts view agency interpretations with great deference where said interpretations represent, "a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *Id.* (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)); *accord United States v. Mead*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

■ *Chevron* suggests that we defer to the Interim Management Policy's interpretation of the FLPMA regarding access vis-à-vis wilderness impairment. The tension between the FLPMA's non-impairment standard and provisions safeguarding access has been left by Congress to agency resolution. The BLM, which is implicitly charged under the FLPMA with administering the statute, resolved this question by publishing the Interim Management Policy. The United States argues that the Interim Management Policy, as an agency policy manual, does not warrant our deference. The United States relies on *Christensen v. Harris County*, for the proposition that, "[i]nterpretations such as those in opinion letters-like interpretations

---

7. The second stipulation is also subject to relatively minor criteria presented in Chapter III, Section B of the IMP. These criteria have limited relevance to the instant discussion.

8. The four lodes held patent numbers well before this date. Joint Exhibit 27 at 7. Existence of a patent presumably denotes a valid discovery date of a particular claim.

contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant *Chevron*-style deference." 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

However, the United States quotes *Christensen* out of context. It ignores that *Christensen* identifies agency interpretations meriting judicial deference based upon whether the agency made the interpretation through the formal exercise of legislatively delegated rulemaking authority. In Christensen, the Supreme Court differentiated between the agency interpretation contained in the opinion letter at issue in the case from interpretations produced after "a formal adjudication or notice-and-comment rulemaking," among other possible expressions of rulemaking proceduralism. *Id.* Similarly, the Supreme Court held in *Mead* that a strong indication that *Chevron* deference should apply to an agency interpretation lies "in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead,* 533 U.S. at 229, 121 S.Ct. 2164. Thus, *Chevron* deference applies to an agency interpretation resulting from the exercise of Congressionally authorized rulemaking procedures. The precise manner in which the interpretation is embodied is not necessarily determinative with respect to deference.

The Interim Management Policy interpretation of the FLPMA merits our deference under *Chevron* because the Secretary of the Interior promulgated the Interim Management Policy following legislatively mandated notice-and-comment proceedings. The FLPMA specifically provides that "[t]he Secretary [of the Interior] shall provide for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give...adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of public lands." 43 U.S.C. § 1712(f) (2002). Furthermore, the BLM promulgated the Interim Management Policy using notice-and-comment procedures and the Department of Interior received significant amounts of public

testimony before adopting the Interim Management Policy in final form. 44 Fed.Reg. 9 (January 12, 1979) (stating that "[m]embers of the public are invited to submit written comments on the draft [of the Interim Management Policy] ... the BLM will hold a national workshop in Washington, D.C., and each BLM State Office will sponsor a public meeting or workshop."); *Rocky Mountain Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 739 n. 6 (10th Cir.1982).

Furthermore, other courts have similarly deferred to the Interim Management Policy interpretation of the FLPMA. *See Sierra Club v. Hodel,* 848 F.2d 1068, 1086–88 (10th Cir.1988), rev'd on other grounds, *Village of Los Ranchos de Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992); *Sierra Club v. Clark,* 774 F.2d 1406 (9th Cir.1985); *Colorado Environmental Coalition v. Bureau of Land Management,* 932 F.Supp. 1247, 1251 (D.Colo.1996). Acting in accordance with the Interim Management Policy, the BLM should have provided Bassett with an alternative access road sufficient to allow commercial access to the Property without crossing non-federal land, had Bassett formally applied for such access.

Moreover, the BLM should have provided complete access to Bassett to the Property from public roads, rather than access only along the Road within the WSA. Regarding potential residential development and water rights of the Property, the IMP guarantees landowners "such access as is adequate to secure ... the reasonable use and enjoyment" of the landowner's property. Interim Management Policy at 30. This standard does not allow the BLM to merely provide any access through federal land. The Interim Management Policy's effort to mediate between the preservation of wilderness areas versus unreasonable interference with landowners' rights requires the BLM to provide alternate access through federal land where necessary to insure that landowners may actually use and enjoy their property. Thus, BLM-provided easement through a WSA to otherwise landlocked private property is inadequate under the Interim Management Policy where circumstances prevent a landowner from reaching that easement without

great expense, if at all, as in the instant case.[9]

Similarly, with respect to mining claims having valid discovery dates as of October 21, 1976, the Interim Management Policy flatly states that "application of the nonimpairment [sic] standard would unreasonably interfere with development of the claim." *Id.* at 30–31. Thus, the Interim Management Policy requires that mining claims satisfying the above criterion deserve access sufficient to the development of said claims. Otherwise, non-impairment would continue to unreasonably interfere with the claim's productivity. Anything less than complete access across federal land in the instant case would continue to unreasonably interfere with Plaintiff's development of the Stephenson–Bennett Mine. Thus, it is reasonable to assume that Plaintiff had sufficient access before the taking to exploit fully the Property's highest and best use.

### 2. *Extent of the Taking*

■ It is well established that a physical taking is defined by the government's corporeal violation of private property. As the Supreme Court has noted, "where real estate is actually invaded . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (quoting *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1871)). This Court has similarly emphasized that, "[t]he hallmark of a physical taking is government occupation of real property." *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757, 762 (1999), quoting *Loretto*, 458 U.S. at 426, 102 S.Ct. 3164 (1982). However, we have also recognized the possibility of compensable stigmatic injuries that extend beyond the tangible aspects of a physical taking. In *Hendler v. United States*, we held that "if fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused

by that fear may be recoverable as part of just compensation." *Hendler v. United States*, 38 Fed.Cl. 611, 625 (1997) (quoting *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1447 (9th Cir.1984)), *aff'd* 175 F.3d 1374 (Fed.Cir.1999); *see also Shelden v. United States*, 34 Fed.Cl. 355, 373 (1995) (reducing post-taking fair market value of property due to stigma associated with erosion and earthquake damage).

■ In the instant case, Plaintiff contends that the physical taking of the Quarry produced a compensable impact on the entire Property's value. Plaintiff claims that the removal action produced two linked effects flowing from the EPA's physical occupation of the Quarry. The first effect was the physical taking of the Quarry itself, which continues to prevent Plaintiff from commercially exploiting the Quarry. The second effect was the diminution of the Property's overall market value due to the stigma associated with possible liability to any buyer for the CERCLA action. It should be noted that this "stigma" amounts to considerably more than a mental attitude on the part of buyers. It is based upon a very real possibility that any commercial activity on the property might lead to regulatory prohibition or real physical danger. While the Court is not convinced that in fact the Property is unusable, it seems clear that a reasonably prudent buyer would consider that quite probable, and be unwilling to purchase the property at any positive price.

At trial and in its briefs, Plaintiff presented expert testimony stating that, "the mere existence of this huge quantity of waste on the [Property], even in a constructed repository, creates too great a potential [CERCLA] liability for anyone to consider purchasing the land." Trial Transcript at 406–9. In summary, Plaintiff's experts in the valuation of contaminated property argued that anyone buying the Property before the EPA completed the removal action would potentially bear liability under CERCLA for all costs incurred in the removal action. Consequently, according to Plaintiff, a reasonable pur-

---

9. Plaintiff claims that it could have purchased an easement through State lands from private property owners. The access thus purchased would

have allowed Bassett to traverse State land to reach the Road, but would most likely have come at great expense to Plaintiff.

chaser would discount the purchase price of the Property by at least the amount of the liability assumed in the post-removal action condition of the Property.

Similarly, Plaintiff also presented evidence that once the presence of hazardous waste has stigmatized property, a reasonable purchaser of said property would discount the sales price for the costs of removal of all of the offending material currently sealed in the Quarry. Plaintiff noted that the stigma flows from the possibility of leakage of contaminants from the waste sealed in the Quarry and the potential "consequent liability placed upon the current owner under CERCLA." Plaintiff's Post–Trial Brief at 23. According to Plaintiff, it follows that just compensation should be the difference between the Property's pre-taking fair market value and the sum resulting from the cost of the removal of the hazardous waste in the Quarry added to the CERCLA liability incurred by the Property's owner.

As the Court noted in addressing our jurisdiction over this matter above, we have temporarily stayed the part of Bassett's claim regarding CERCLA liability damages because we do not presently have the facts to address this issue. It must await a determination of the existence of such liability and its connection with the government's removal action.

However, the Court finds that stigma associated with general contamination dramatically affected the entire Property's value. *Hendler* and *Shelden* permit recovery for diminution in value due to the general fear of a hazard caused by a taking, assuming that the hazard's affect on marketability is measurable. *See Hendler*, 38 Fed.Cl. at 625 (quoting *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1447 (9th Cir.1984) ("[I]f fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation.")); *see Shelden*, 34 Fed.Cl. at 373. The United

States' expert appraiser in the instant case recognized that general market perception of contamination on a future residential development site results in the depreciation of property value. Joint Exhibit ("Jt.Ex.") 30 at 8, 11; Jt. Ex. 159 at 3. The United States' expert rigorously examined the sale of comparative property to quantify the impact of general market perception on the Property's fair market value. *See* Jt. Ex.30 at 8, 11; Jt. Ex. 159 at 3. The Court therefore accepts Plaintiff's argument that the Quarry's taking negatively impacted the entire Property's value on the basis of the United States' evidence. In analyzing this impact below, we accept the United States' computations regarding the Property's diminution in value as a result of the stigma associated with hazardous waste.[10] At the same time, we leave open the possibility of additional damages resulting from the potential CERCLA liability. This will be considered at such time as we lift the stay on that portion of this case.

### 3. *The Removal Action As A Special Benefit*

When only a portion of private property is physically taken, the amount of compensation owed to the property owner must be reduced by any special benefits from the government action accruing to the remainder of the property. *Hendler*, 38 Fed.Cl. at 617. Special benefits are benefits which inure to the particular property suffering the taking, rather than to the general public. *Id.* The United States argues that the removal action conferred a special benefit upon the Property which we should deduct from any ultimate damages valuation.

Here, according to the United States, the removal action benefitted that part of the Bennett Lode not used as a contaminated waste repository and the San Augustin Lode by reducing the amount of contaminants located on those portions of the Property. The United States further claims that the investigative activity which preceded

---

10. The United States' expert appraiser applied a 30% reduction in the fair market value of the Property's surface area for residential development due to the observed stigmatic effect of contaminants on land value. Jt. Ex. 30 at 8, 11;

Jt. Ex. 159 at 3. The appraiser did not apply said reduction to other components of the Property's value, presumably because the contamination did not significantly diminish other aspects of the Property's worth.

the removal action benefitted the entire Property by identifying the nature and extent of contamination on the Property, thereby eliminating uncertainty regarding contamination of the Property. Because this uncertainty depressed the fair market value of the Property, the United States argues that the investigation served to increase the Property's value.

This argument, however, leads nowhere. Even if the Court accepted the United States' argument that the removal action benefits the Property's value, the United States failed to include any evidence in the trial record regarding the amount by which said benefit increases the Property's value. Thus, we cannot offset compensable damages for the benefits allegedly conferred by the removal action. Having resolved these issues, the Court now turns to the determination of the Property's fair market value as a function of calculating the just compensation owed to Plaintiff.

### B. Just Compensation Valuation

#### 1. *Appraisal Methodologies*

##### a. *Bassett*

At trial and in their briefs, the two parties presented competing expert analysis regarding the fair market value of each highest and best use of the Property before and after the removal action. Plaintiff separated its fair market valuation into two distinct methodologies for calculating the value of aggregate mining and residential development, respectively. Plaintiff calculated the fair market value of aggregate mining on the Property prior to the taking by determining the present value of the future income stream of aggregates that Plaintiff could have mined on the Property absent the taking over a twenty year period. This methodology required an estimate of the annual production of aggregates on the Property and the selection of a suitable discount rate to determine the present value of the future royalty income stream. Plaintiff's appraisal assumed that access to the Property from public roads existed to support large-scale aggregate mining on the Property, and that pre-taking contamination on the Property would not have hindered mining operations.

Plaintiff began by evaluating the local market for aggregates and arrived at a production royalty of $0.75 per ton of aggregates payable quarterly. Multiplying projected annual production by this royalty rate, Plaintiff projected royalties from January 1999 until January 2018. *Id.* at 25. Plaintiff then discounted this cash flow to present value using a discount rate of 15% before tax, setting the present value of aggregate mining on the Property as of January 1, 1999, at $2,068,970. *Id.* at 25. Later, based upon comparison of the Property's projected income stream with the present value of royalty income received by a closely located property, the New Organ Quarry, Plaintiff raised this figure to $3.2 million.

Plaintiff used comparable sales analysis to gauge the removal action's impact on the residential development of the Property. Assuming no contamination in the Property's pre-taking condition and complete access, Plaintiff estimated that prior to the taking, the 50 acres of the Property not designated for aggregate mining could have supported the building of ten homes for commercial sale prior to the removal action. Plaintiff therefore evaluated the price per acre of four residential development property sales deemed roughly comparable to the Property to estimate the likely value of the Property for residential development. *Id.* at 39–44. According to Plaintiff, the comparison showed that the value of the Property for residential development prior to the taking was $310,000. In addition to aggregate mining and residential value, Plaintiff adopted the United States' calculation of the Property's pre-taking water rights value as $45,000. Plaintiff added the value of aggregate mining, residential development, and water rights to estimate the overall pre-taking fair market value of the Property as $3,555,000.

Plaintiff calculated the Property's post-taking fair market value by assuming that the removal action robbed the Property of its entire pre-taking value. Furthermore, Plaintiff argued that a reasonable purchaser of the Property after the taking would discount the Property's purchase price by $5,251,000, for

the amount of CERCLA liability threatened by the government in the government's May 20, 1999, proposed judicial consent decree. Plaintiff also claimed that a reasonable purchaser would discount the Property's purchase price after the removal action for the cost of the removal of hazardous waste from the Property. Plaintiff estimated the cost of removal at around $84 million. The sum of the post-taking valuations resulted in a negative overall post-taking fair market value of – $89,251,000 for the Property. Subtracting the Property's pre-taking fair market value from the Property's post-taking fair market value, Plaintiff argued that we should award Bassett just compensation in the amount of $92,806,000.

### b. *The United States*

In contrast to Bassett, the United States used comparable sales analysis to evaluate the overall fair market value of the Property. Furthermore, the United States attempted to account for the values of each highest and best use of the Property as a single unit, rather than assuming that each highest and best use of the Property could be considered separately. The United States adjusted the overall calculation of the Property's fair market value for the fact that a buyer purchasing the Property could not fully exploit each separate component representing the Property's highest and best uses. A buyer purchasing the Property for its mining potential could not develop the surface of the Property for residential development until mining the Property were no longer profitable. Similarly, a buyer interested in the surface development of the Property for residential use would be unable to maximize the profitability of the Quarry. Thus, the United States took a conservative approach to appraising the Property's surface value and water rights before the taking because a potential buyer would most likely be interested in realizing the Property's greatest potential worth, aggregate mining. Conversely, the value of the Property's surface area increased after the taking because the removal action deprived the Property of mining value and a buyer would likely value the Property more for residential development.

Keeping these adjustments in mind, the United States estimated the value of the Property's value for (1) residential development by assessing eleven real estate sales and three listed offerings comparable to the Property; (2) aggregate mining potential by direct sale comparison with three analogous land parcels; and (3) water rights through six comparative sales. The United States examined the resultant sales data against several sets of background assumptions, each of which affected the ultimate appraisal of the Property's fair market value. The United States initially assumed that Plaintiff enjoyed unrestricted access to the Property. In a subsequent update completed on January 15, 2000, and based upon new information, the United States calculated just compensation under three varying scenarios. In the first scenario, Plaintiff could access the Property via an alternate access route. In the second scenario, Plaintiff had limited access to the Property through the Road. In the third scenario, Plaintiff did not have any legal access to the Property. The United States assumed in all four appraisals that the Property was contaminated only after the removal action resulted in the storage of contaminants in the Quarry. The United States therefore reduced the post-taking fair market value of the Property because of the stigmatic effect of the contaminants on potential buyers of the Property.

After receiving additional information related to the Property, the United States formulated a final appraisal on April 1, 2000. In the final appraisal, the United States incorporated the fact that the Department had discovered contamination on the Property before the removal action and thereby reduced the pre-taking appraisal of the Property's value. The appraisal also assumed the absence of any legal access to the Property. This ultimate valuation set the overall fair market value of the Property before the taking at $36,150.00.

The United States also calculated the fair market value of the Property after the taking for each scenario. The post-taking appraisals varied depending upon the quality of the access that each appraisal granted to Plaintiff. For the most part, where access was

available, the post-removal action worth of the Property was equal to the pre-taking fair market value of the Property reduced by the value of aggregate mining and water rights "taken" by the removal action. The United States made additional minor adjustments in the post-taking analysis for the contaminated condition of the Property and the fact that the removal action stripped the Property of utility infrastructure, such as electricity. The conclusive analysis assumed that insufficient access to the Property existed to support mining operations. It also assumed a pre-taking contamination of the Property. The United States calculated the post-taking value of the Property as $34,600. The United States argued that just compensation in the instant case should equal the difference between the pre-taking value of the Property, $36,150.00, and the post-taking value of the Property, $34,600, reduced by the unspecified value of the special benefits incidentally conferred upon Plaintiff by the removal action.

### c. *Evaluation of the Methodologies*

The Court carefully considered both Bassett's and the United States' valuation approaches. Overall, we find the United States' methodology, if not the exact details of its ultimate calculations, more persuasive than Plaintiff's approach for three reasons. First, we hold that Plaintiff's request for compensation of $84 million for the cost of the removal of the hazardous waste in the Quarry is unreasonable. Just compensation for a taking under the Fifth Amendment requires that we put a deprived owner "in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers*, 409 U.S. at 474, 93 S.Ct. 791 (internal citations omitted). The necessary corollary to this basic damages principle is that the Court may not place a deprived owner in a better position by a Fifth Amendment taking recovery than if the taking at issue had not occurred. No reasonable valuation of the Property's value before the EPA's removal action estimates the Property's value at a level even remotely close to $84 million.

The flaw in Plaintiff's approach, however, is confusing two classic damage theories. To illustrate this an example might help. Assume a plaintiff's bull-dozer is negligently damaged by defendant. The cost of repairing the damage is $10,000. However, the actual effect on the bull-dozer's market value or usefulness is negligible. In this example the court will award zero damages. If the court awarded the $10,000 it would be a $10,000 windfall since it is clear that no rational plaintiff who did recover that $10,000 would use the money to repair the bull-dozer to its pre-accident state, since that would give no additional value. Likewise, awarding Plaintiff $84 million would put Plaintiff in a far better position than he was in before the taking. He certainly would not use that money to restore the Property to its pre-taking value, since the $84 million would only get the Plaintiff a property that he valued at $3.55 million. Not a very good deal!

Second, Plaintiff failed to use comparable sales analysis to arrive at a fair market valuation of the Property with respect to aggregate mining, the most significant aspect of the Property's overall pre-taking value. In contrast, the United States used comparable sales analysis throughout its determination of the Property's fair market value. It is well established that "comparable sales are considered by the courts to be the best evidence of fair market value, and thus preferable to other forms of valuation." *Stearns Co., Ltd. v. United States*, 53 Fed.Cl. 446, 458 (2002) (citing *United States v. 50 Acres of Land*, 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984)); *Kirby Forest Indus. Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Other valuation methods may prove useful, but a comparable sales methodology is a generally superior indicator of value if an active real estate market existed in the vicinity of the subject property prior to the taking. *See Florida Rock Indus., Inc. v. United States*, 45 Fed.Cl. 21, 35 (1999) (citing *Whitney Benefits, Inc. v. United States*, 18 Cl.Ct. 394, *affirmed* 926 F.2d 1169 (Fed.Cir.), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991)).

Here, Plaintiff valued the Property's worth for aggregate mining by analyzing the Prop-

erty's pre-taking future income stream, es-chewing the comparable sales methodology favored by the courts. Plaintiff claims that future income stream analysis was appropriate here because the valuation of mineral interests is preferably done by determining the present value of a future income stream. Plaintiff supports this view by arguing that the federal government, in its Uniform Appraisal Standards for Federal Land Acquisitions, states that, "[p]roperty having a highest and best use for mineral production may be appraised utilizing an income approach when comparable sales are lacking." Uniform Appraisal Standards at 23–24 (internal citations omitted). Plaintiff further points to *Whitney Benefits, Inc. v. United States,* in which the Federal Circuit approved of the use of future income stream analysis, as support for the relevance of future income stream analysis in the present case. *See* 962 F.2d 1169 (Fed.Cir.1992).

Plaintiff's reasoning is flawed. Comparable sales data derived from comparison of land analogous to the Property was available based upon the evidence presented in the United States' appraisals. Thus, the Uniform Appraisal Standards would not support the use of future income stream analysis in the present case. Furthermore, in *Whitney Benefits, Inc.,* the Federal Circuit affirmed the use of future income stream analysis only on the basis of a finding by the lower court that reliable comparable sales data was lacking at trial. *See Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, *aff'd* 926 F.2d 1169 (Fed.Cir.), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991). A careful reading of the case affirms the presumption in favor of the use of comparable sales data, when available.

Lastly, Plaintiff unrealistically separated the three aspects of the Property's overall highest and best uses—aggregate mining, residential development, and water rights. This fragmentation produces a relatively unreliable valuation because it ignores the fact that a buyer could not make optimal use of the Property for each highest and best use concurrently. Thus, it is highly unlikely that a buyer would value the Property as a function of the sum of the maximum values of the

Property's highest and best uses considered separately. In contrast, the United States strove to capture the fact that a potential buyer of the Property would place highest value on the Property's most valuable use. The government's calculations thereby reflected the interdependent nature of the Property's coexistent highest and best uses.

### d. *Calculating Just Compensation*

Having determined the superiority of the United States' general method of determining the Property's fair market value, we now adopt that method and the United States' relatively thorough comparable sales data to assess the fair market value of the Property before and after the taking. For clarity's sake, we separate this determination into the three parts constituting the Property's highest and best uses. This separation avoids the problems inherent to Plaintiff's fragmented valuation methodology because the separation is merely the superficially divided exposition of the United States' otherwise holistic valuation analysis. Our substantive just compensation assessment adheres to the government's comprehensive approach, although we adjust individual aspects of the approach.

#### (i) *Aggregate Mining*

Although we adopt the methodology used by the United States to determine just compensation in this case, we do not accept every assumption which the United States applied to that methodology. The government's final analysis presented on April 1, 2000, assumes that Plaintiff lacked access sufficient to permit aggregate mining of the Property before the removal action. This assumption results in a significant reduction of the just compensation due to Bassett.

On the whole, the first scenario presented in the government's January 15, 2000, update more accurately reflects conditions affecting the Property's fair market value than the government's final analysis presented on April 1, 2000. The first scenario presented in the United States' January 15, 2000, calculation of the Property's fair market value assumes that Plaintiff held said access via an alternative access route which cut through otherwise prohibited BLM lands. This as-

sumption coheres with our finding that access to the Property was attainable through such an alternative route.

The Court therefore uses the first scenario to account for the value of each highest and best use of the Property throughout our just compensation analysis, adjusting the scenario where prudent. Consequently, we set the pre-taking fair market value of the Property's aggregate mining potential at $348,900 and the post-taking value of the Property's aggregate mining rights at $0 in accordance with the first scenario presented in the government's January 15, 2000, appraisal.

### (ii) *Residential Development*

Here, we modify the first scenario in one important respect to calculate the Property's residential development value: the reduction of the Property's pre-taking surface area value because of waste contamination. The first scenario reduces only the Property's post-taking worth by 30% due to the stigmatic effect of the Property's contaminated state on potential buyers. This ignores the fact that the Department identified significant and potentially dangerous amounts of contaminants on the Property before the EPA's removal action. *See* Jt. Ex. 99.

In contrast, the government's conclusive April 1, 2000, appraisal aptly noted the pre-taking contamination cited by the Department and therefore reduced both the Property's pre-taking and post-taking surface area values by 30% apiece due to the stigmatic effect of contamination on potential buyers. The Court similarly applies the 30% reduction to both the pre-taking and post-taking value calculation of the Property for residential development purposes under the government's first scenario given the Property's contaminated pre-taking condition. All other assumptions presented in the government's first scenario, such as the pre-taking presence of utilities on the Property and the post-taking absence of these utilities from the Quarry, apply to our valuation of the Property's surface area.

The first scenario in the United States' January 15, 2000, appraisal valued the Property's pre-taking surface area at $2,500 per acre of available surface area. The appraisal arrived at this rate after conducting a thorough comparable sales analysis. This analysis included a downward adjustment of the Property's surface area value for residential development because the full value of residential development would not actualize until after quarrying on the Property had ended in 2018. This assumes that most buyers would value the Property for its most profitable feature, aggregate mining. Applying the $2,500 per acre rate to the Property results in a value of $122,500. Reducing this amount by 30% due to market reactions to the Property's contamination before the removal action yields a pre-taking fair market value of $87,750 for the Property's residential development worth.

Because the EPA's removal action prevents aggregate mining in the Quarry, any purchaser of the Property would value the Property most highly for residential development subsequent to the removal action. Consequently, the Property's value for residential development increases after the taking. The first scenario in the government's January 15, 2000, appraisal values the Property at $3,500 per acre of surface area. After multiplying this rate by the Property's total acreage and applying a 30% reduction for the post-taking market reaction to the contamination, we set the post-taking fair market value of the Property for residential development at $120,050.

### (iii) *Water Rights*

The first scenario uses comparable sales to value the Property's water rights at $250 per acre-feet of surface area. Applying this amount to the Property's total surface area yields a fair market value of $45,000 for the water rights before the removal action. The water rights lose all value after the taking. This loss in value reflects the fact that the ability to use water rights for such purposes as construction, land application, and irrigation significantly lessen after the taking. Moreover, it is unlikely that water on the Property could be used for residential purposes given the high levels of contamination on the Property after the removal action.

None of the appraisals claims that pre-taking contamination diminished the value of water on the Property, although at least one

 

appraisal explicitly notes that water originating from underground shafts on the Property had likely been "contaminated for many years" before the taking. Jt. Ex. 28 at 41. Thus, we do not apply the 30% reduction in the value to the Property's pre-taking water rights that we applied to the Property's pre-taking surface area value.

### (iv) *Just Compensation*

As previously discussed, we calculate the just compensation due to Plaintiff in this matter by subtracting the overall fair market value of the Property after the taking from the overall fair market value of the Property before the taking, and awarding Plaintiff the difference between the two numbers. The overall fair market value of the Property after the removal action is $120,000. The overall fair market value of the Property before the removal action is the sum of $348,900, $87,750, and $45,000: $481,650. The Court therefore finds that just compensation in the present case, the difference between the Property's post-taking and pre-taking overall fair market values, is $361,650. This amount is subject to interest, attorney's fees, and costs.

### e. *Interest, Attorney's Fees & Costs*

Deprived owners are entitled to interest on just compensation awarded pursuant to Fifth Amendment takings. *Stearns Co., Ltd., v. United States,* 53 Fed.Cl. 446, 466 (2002) (citing *Kirby Forest Indus. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984)). Thus, we award Plaintiff compounded pre-judgment interest from the date of the taking until the date of the judgment. *See Id.* (citing *United States v. Thayer–West Point Hotel Co.,* 329 U.S. 585, 588, 107 Ct.Cl. 714, 67 S.Ct. 398, 91 L.Ed. 521 (1947)); *Miller v. United States,* 223 Ct.Cl. 352, 360, 620 F.2d 812 (1980). We date the taking as having occurred on October 6, 1997, the first day of the removal action, for the calculation of pre-judgment interest. The Court uses this date because it marks the beginning of the physical intrusion from which all damages in this matter arise. Interest computation will be based upon the Contracts Disputes Act, 41 U.S.C. §§ 601–13 (1982). *See Jones v. United States,* 3 Cl.Ct.

4, 7 (1983). The Court further awards attorney fees and costs incurred as a result of litigation to Plaintiff under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. 42 U.S.C. § 4601 *et seq.* (1995 & 2002 Supp.).

### CONCLUSION

The Court concludes that the EPA's removal action constituted a taking of Bassett's property warranting just compensation to Bassett under the Fifth Amendment. We therefore award Plaintiff $361,650 in just compensation, plus compound interest from October 6, 1997, attorney's fees, and costs. The Court will hold a status conference within ninety days of the publication of this opinion to allow the parties to inform the Court as to the situation of any CERCLA claims made by the United States against Plaintiff.

IT IS SO ORDERED.